**John Howard ABDNOR,**

v.

**The STATE of Texas.**

**No. 05–81–01289–CR.**

Court of Appeals of Texas, Dallas.

Oct. 9, 1992.

Rehearing Denied Dec. 30, 1992.

Ronald L. Goranson and Ruth Kollman, Dallas, for appellant.

Pamela Berdanier, Dallas, for appellee.

Before ENOCH, C.J., and KAPLAN and ROSENBERG, JJ.

## OPINION ON REMAND

ENOCH, Chief Justice.

The issue in this case is not whether John Howard Abdnor killed Janis Ballew, but whether John Howard Abdnor was insane at the time of the offense. The jury rejected appellant's insanity defense, convicted him of murder, and sentenced him to life in prison. This Court originally affirmed the trial court's judgment. *Abdnor v. State*, 756 S.W.2d 815 (Tex.App.—Dallas 1988), *rev'd*, 808 S.W.2d 476 (Tex.Crim.App. 1991). This appeal comes to us on remand from the Court of Criminal Appeals for a harm analysis on a preserved jury charge error. Contrary to our opinion, the Court of Criminal Appeals held that the trial court abused its discretion in admitting the testimony of Lowell Bryan Parsons with regard to certain extraneous offenses without providing a limiting instruction. *Abdnor v. State*, 808 S.W.2d 476, 478 (Tex. Crim.App.1991).

On remand, appellant brings one point of error. He contends that the trial court's failure to instruct the jury to consider these extraneous offenses only for the limited purpose of explaining Parsons' prior inconsistent statement was harmful error. We conclude that the admission of the extraneous offenses without a limiting instruction was harmless, overrule Abdnor's point of error, and affirm the trial court's judgment.

### A. STANDARD OF REVIEW— HARM ANALYSIS

■ Where an appellant timely preserves jury-charge error, reversal is required if the error is "calculated to injure the rights of the [appellant]," which means no more than that there must be *some* harm to the accused from the error. Tex. Code Crim.Proc.Ann. art. 36.19 (Vernon 1974); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (emphasis in original). "*[S]ome* harm" is defined as the presence of *any* harm, regardless of degree. *Arline v. State*, 721 S.W.2d 348, 351 (Tex.Crim.App.1986) (emphasis in original). In determining whether the error was harmful and reversal is required, an evidentiary review must be conducted, as well as a review of any other part of the record as a whole that may illuminate the actual, not just theoretical, harm to accused. *Almanza*, 686 S.W.2d at 174. For this review, the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record as a whole. *Id.* at 171. We are presented with an atypical issue. In explaining his original objection, defense counsel stated that these extraneous offenses were objectionable because they "would have a tendency to show that the Defendant is a criminal generally ...", the traditional objection to extraneous offenses. In fact, on review for harm by an appellate court, we ordinarily must determine whether the appellant might have been convicted, not for having actually committed the crime charged, but just for being a criminal. *Wilkerson v. State*, 736 S.W.2d 656, 659 (Tex.Crim.App.1987). However, appellant's

conviction was not based upon an affirmative finding of commission of the offense, but was based upon his failure to prove by a preponderance of the evidence that he was insane at the time of the offense. Under this circumstance, we review the entire record to see if appellant might not have been found sane at the time of the offense but for Parsons' testimony that was unlimited by a jury instruction.

## B. EXTRANEOUS OFFENSES

■ On direct examination by the State, Parsons [1] testified that two days before the murder in 1980, appellant, who was highly intoxicated, telephoned Parsons and said that the victim, Janis Ballew, had had an abortion, that he was "mad as hell," and that he and the victim had broken up. Parsons quoted appellant as saying, "That bitch really screwed up this time . . . if she walked through that door right now, I'd blow her head off. I'd just blow her right up against the wall." Parsons then stated that he told appellant not to think like that, that he could not get away with things like that, and that appellant laughed and said, "Yeah, well, I know some things you don't."

However, on September 12, 1981, shortly before trial, Parsons told the prosecutor that he had lied about this telephone conversation with appellant. The prosecutor brought the statement to appellant's and the trial court's attention. On cross-examination, appellant used the statement in an effort to impeach Parsons. Appellant also elicited testimony from Parsons establishing that he spent time in the psychiatric ward of Baylor Hospital and that he steadily used drugs, both prescription and illegal, during the time period about which he testified.

### 1. Testimony

In an attempt to rehabilitate Parsons on re-direct examination, the State took up the issue of Parsons' inconsistent statement. The testimony was as follows:

1. Parsons was a friend of appellant and formerly a fellow psychiatric patient with appellant at

Q. Mr. Parsons, with respect—I believe my last question was with respect to your telephone call to me on Saturday, the 12th, before the Monday that the trial was to begin.

I believe I asked you if you had a reason for, at that point in time, with the trial approaching the following Monday, to make those statements to me.

Do you recall that?

A. Yes.

Q. All right. You have testified earlier that when the Defendant was intoxicated, he got violent and got in people's faces; is that correct?

A. Yes, sir; that's right.

Q. Let me ask you if you have had occasion to be in the presence of the Defendant—Miss Ballew being killed on the 27th of July, which was a Sunday morning, and the telephone call being that Friday night before that, if within the week or two-week period prior to that, you had occasion to be in the presence of the Defendant?

[Defense Counsel]: Objection, Your Honor. The question calls for extraneous matters and is not limited solely to the purposes for which it's being offered.

The Court: Well, as to that specific question, as to whether he was in the presence, I overrule the objection.

A. Yes, I was.

Q. Do you recall what day of the week that was, or what night it was?

A. It was a Saturday night, I believe.

Q. Was it the Saturday immediately preceding the killing of Miss Ballew, or was it the Saturday before that, or do you recall which Saturday it was?

A. It was not the preceding Saturday, but the week before.

Q. The Saturday before that?

A. Yes.

Q. Now, I'll ask you if the events that occurred on that night, plus conversations

Baylor Hospital.

or plus information that was communicated with you—to you had a bearing upon what had occurred—had a bearing upon you telling me that this—you made this up, because you didn't want to testify. Did it; what had happened with the Defendant and you?

A. Yes.

Q. Tell the jury what it was that caused you, and why you called me, and why you told me that; in your own words.

A. Well, no; I'm sorry. Back up.

Q. Okay. When you called me and you told me, "I made this up," because you didn't want to testify on Monday ...

A. Yes.

Q. ... was there a reason?

A. Yes, there was a reason.

Q. What was it? What was the reason?

A. I was afraid.

Q. Okay. Tell me—tell the jury, in your own words, why you were afraid.

A. I thought of this trial, and I heard about it and read about it, and I didn't know what the outcome was going to be. I've seen what money can do.

\* \* \*

Q. You had followed the trial in the paper; is that correct?

A. Yes.

Q. Was your last answer, "you have seen what money can do?"

A. Yes.

\* \* \*

Q. With respect to why you called me and said that you made this up and you didn't want to testify on Monday, can you tell us whether or not that was related to you having followed the newspaper—followed the case in the newspapers and seen what money can do?

\* \* \*

Q. Did you answer that question?

A. No.

Q. Okay. Were those reasons part of the reasons that you related that informa-

tion to me; that you didn't want to testify, and you made it up?

A. Part of the reasons; yes.

Q. What did you feel was going to happen to you, if anything, after the trial, and did that have anything to do with you telling me you made this up?

[Defense Counsel]: Objection; calls for speculation.

The Court: Overruled.

[Defense Counsel]: Exception.

Q. Did you feel like you were going to have anybody that would be with you and protect you after you testified?

A. That's—the reason I was scared.

A. Okay.

A. I have no guarantee of personal safety after this trial is over with ...

Q. Do you mean that—

A. ... and I'm scared.

Q. Do you mean that?

A. Yes.

[Defense Counsel]: Objection; bolstering, Your Honor.

The Court: Sustained, as to the last statement ...

\* \* \*

[Defense Counsel]: May we have the jury instructed to disregard the question and the answer.

The Court: Disregard that question and answer.

[Defense Counsel]: Mistrial.

The Court: Overruled.

[Defense Counsel]: Exception.

Q. Was there any—in connection with being afraid, was there any activity involving the defendant and you that caused you to be afraid and to make those statements to me?

A. Yes. He had previously pulled a knife on me.

Q. Now, when was that? When did he do that?

A. About a month or two before.

\* \* \*

Q. Can you tell us the circumstances surrounding that?

A. Yes, I can.

Q. How it occurred?

A. We went drinking together, and as he got more intoxicated, he became more violent, and we got in kind of an argument, and he pulled a knife, and I let him know he couldn't do that.

Q. How did you let him know he couldn't do that?

A. I kicked him a good one.

Q. All right.

A. And that was about the end of that.

Q. All right. Now, the following week, in connection with your being afraid to testify in this thing, did you have any conversations with Mike Durand?

A. Yes, I did.

Q. What did Mr. Durand tell you?

[Defense Counsel]: Objection to hearsay ...

The Court: Overruled.

[Defense Counsel]: ... because, here again, Your Honor—at this time, I would request that the Court limit the testimony that is not related.

It's not being offered for the truth of the matter; just how it affects the credibility of this witness, and should not be considered at all against the accused, John Howard—

The Court: I will sustain it unless a predicate is laid that's proper.

Q. Did this statement have any bearing upon you being afraid to testify in this case and telling me you made this up; what Mr. Durand told you?

A. Yes, it did.

[Defense Counsel]: I would still make the same request for limiting instructions, Your Honor.

The Court: Overruled.

[Defense Counsel]: ... because, again, the *testimony is not being offered for the truth of the matter.*

The Court: Overruled.

[Defense Counsel]: Exception.

Q. What did he tell you?

A. He told me that John had called and said he was going to take a .45 and bring it over and blow my head off.

Q. Now, how long was this after when you had taken the knife away from, when he was—you were out with him and he got drunk?

A. A couple of weeks.

Q. A couple of weeks later?

A. Yes.

Q. And how—what proximity was that to when he called you about Janis Ballew?

A. Two weeks later.

Q. Okay. So, we're talking about a month period, then?

A. A month.

*    *    *

During re-cross examination, the defense followed up with questions pertaining to the extraneous offenses.

Q. All right. Now, I want to talk to you about, basically, what you've brought up on re-direct here.

*    *    *

Q. All right. Now, you testified that Durand told you about some kind of threat—or, he communicated to you that John Howard said something to him about you and a gun; is that right?

A. Yes, sir; that's right.

Q. Now, when did he communicate that to you?

A. About two weeks before the murder.

*    *    *

Q. All right. Now, did you take that statement from Durand seriously, or did you just blow it off as, you know, somebody just running his head?

A. I just blew it off, at the time.

Q. Just blew it off, at the time, because you didn't—did you report it to the authorities?

A. No, sir.

*    *    *

Q. Did you ever confront John Howard Abdnor with this?

A. No, sir, I didn't.

Q. You never mentioned it to him?

A. No, sir.

\* \* \*

Q. Did you ever confront him with this threat that you claim Durand had related to you that John Howard had made?

A. No, sir.

Q. You never even mentioned it to him?

A. No, sir.

Q. Here's a man that you claim—you're talking to him on the phone, and he's calling you on the phone, and you claim that he has made some kind of statement like that, or you've been told he's made some kind of statement like that, by Durand, and you talked to him for fifteen or twenty minutes, and say, "Hey, John Howard. What's this I hear about you saying you're going to get a gun a [sic] shoot me?" you never did do that?

A. No, sir, I didn't.

\* \* \*

Q. Now, at that point in time, or at any time in that second conversation, did you ever say, "Hey, John Howard, what about when you threatened ..." or, "Did you threaten me," or "Did you tell Durand you was [sic] going to shoot me?"

A. No, sir, I didn't.

\* \* \*

The second extraneous offense was mentioned a few pages later.

Q. All right. Now—and you say that two weeks or two Saturdays before that Sunday—thirteen days before that Sunday—that was when you and John Howard had had the incident where he pulled the knife on you?

A. Yes, sir.

\* \* \*

Q. All right. Now, this occasion when you claim that John Howard pulled a pock-et knife on you, what kind of pocket knife was it?

A. It was a small pocket knife.

\* \* \*

Q. All right. And you said you kicked John Howard "a good one;" is that right?

A. Yes, sir.

\* \* \*

A. I kicked him to let him knew [sic] he couldn't get away with that.

Q. All right. At that point in time, had he already put the pocket knife back in his pocket; when you kicked him?

A. Yes, sir.

\* \* \*

Q. All right. Now, did he try to get the pocket knife back out to hurt you?

A. No, he didn't.

Q. All right. Now, after this—was you about as drunk as he was? Both of you had been—

A. I don't know how to answer that.

Q. Well, both of you had had plenty to drink?

A. We had both been drinking, yes.

\* \* \*

Q. And after the argument, or after the argument began, he draws a knife on you—a little ole pocket knife—and he puts it back up; you hit him in the stomach, to show him he can't get away with it and do it, then, y'all get back in the car and drive off; right?

A. That's right.

\* \* \*

Q. Now, as a matter of fact, after that happened, y'all went on to some other places or clubs, didn't you?

A. Yes, sir, we did.

\* \* \*

### 2. Jury Argument

The only other references to the extraneous offenses were during the State's jury argument when the State was attempting to stress the credibility of its witnesses.

[State]: If Bryan Parsons is telling the truth, if Marsha Herring is telling the

truth, it shows a predisposition, a pre-planning, a pre-thought process, on behalf of the Defendant.

Mr. Taylor told you, he said, "I don't know how in the world anybody—Mike Gillett, Gerry Banks; whoever it may be—could stand up in front of twelve people and vouch for the credibility of Bryan Parsons."
I can and I will, and I'll do my best to explain why.

\* \* \* \* \* \*

[State]: —when the Defendant, during the interim time period, had been in St. Joseph's Hospital.

What did Bryan Parsons tell you? He said, "It was about that time that I contacted the D.A.'s office, and when it got close to trial, I said, "Hey, I made it all up."

And why?

"Because of what I had seen in the newspapers," ladies and gentlemen, "and because of what the Defendant told Mike Durand he was going to do to me," ...
[Defense Counsel]: Objection, Your Honor. He's outside the

.   .   .   .   .

[State]: ... from the—
[Defense Counsel]: ... record—excuse me, Mr. Gillett.

He's outside the record; it's not a proper reference, and that testimony was also admitted for the limited purposes of the credibility of Bryan Parsons, and not for general purposes only.
The Court: I sustain the objection at this time.

Re-state ...
[Defense Counsel]: May we have—
The Court: ... or rephrase—
[Defense Counsel]: May we have the jury instructed to disregard that argument?
The Court: Disregard that, the way it was phrased.
[Defense Counsel]: Motion for mistrial, Your Honor.
The Court: Overruled.

[Defense Counsel]: Exception.

\* \* \* \* \* \*

[State]: In connection with what he said to you: "... there won't be anybody there to protect me."

Now, how do we know he's telling the truth? Why should we believe him? Why should you believe him?

He said that he—the Defendant, he has been out with him; he's been drinking with him. He says that he drinks and gets intoxicated, he gets violent, and gets in people's faces.

\* \* \* \* \* \*

Four pages later, after the State discussed other witnesses' testimony that corroborated Parsons', the following occurred:
[State]: From Mike Durand, who owned Strawberry Field [sic] where the Defendant used to work and was terminated; that information was related by Mr. Durand to Mr. Parsons about what the Defendant would do; about kicking him after the Defendant pulled a knife on him, and we got into that.

It's a very simple thing, ladies and gentlemen. If you want to shove it down Bryan Parsons' throat: Durand. They have done everything else; you didn't see him. He said—
[Defense Counsel]: We would again object to stating what Mr. Durand would say, Your Honor. That's outside of the record; an improper statement.
The Court: Sustained as to that particular point.
[State]: Mr.—
[Defense Counsel]: May we have the jury instructed to disregard the argument?
The Court: Disregard that point.
[State]: Mr. Durand—
[Defense Counsel]: Excuse me, Mr. Gillett. Mistrial.
The Court: Overruled.
[Defense Counsel]: Exception.

During Parsons' testimony, appellant timely requested an instruction limiting the jury's consideration of Parsons' testimony concerning Abdnor's threats. The trial court stated that the request was denied at

that time, but would be considered when the court took up the charge. Later, appellant's requested instruction for the jury charge was denied as vague. The Court of Criminal Appeals held that this was error and that the error had been preserved. *Abdnor*, 808 S.W.2d at 478.

The aforementioned quotes are the only testimony or argument of any form presented before the jury concerning the extraneous offenses.

Since the principal issue in this case was appellant's sanity, the question is whether the extraneous offenses were drawn into appellant's insanity defense. The appellant also points to another, but unobjected to, portion of the prosecutor's jury argument:

> Bryan Parsons told you that the Defendant knew the difference between right and wrong, and could conform his conduct to the requirements of the law, if he wanted to. He just wouldn't.

Appellant contends that, through this statement, the State inferentially used Parsons's testimony about the extraneous offenses, impermissibly, to refute Abdnor's insanity defense.

## C. CONCLUSION

The error in this case is clear: evidence of extraneous offenses was allowed to be presented to the jury without a limiting instruction. The emphasis placed on these offenses by the State is also clear: to rehabilitate Parsons' testimony during redirect examination and to reinforce his credibility during jury argument. No emphasis was placed on the extraneous offenses with regard to the issue of sanity. Parsons' testimony about the extraneous offenses, presented by the State to explain Parsons' inconsistent statements, covered less than three pages out of his 260 pages of testimony in the 5,600–page statement of facts. No other evidence was presented by the State regarding either the extraneous offenses or the credibility of Parsons. The prosecutor did not question any other witness regarding the offenses. And, the State did not argue that the testimony should be used for any purpose other than assessing Parsons' credibility.

The State did, however, elicit the following regarding appellant's sanity: Parsons testified that two days before the offense appellant said that he would blow the victim's head off and that appellant was intoxicated when he made the statement. He also testified that appellant became very violent when he was intoxicated. Appellant's ex-wife, Sandra Chasteen, testified that, on the night of the murder, appellant called and said, "I just called to tell you I killed a fucking flight nurse," and that appellant acted and talked on the phone like he did when he was on drugs. A Dallas County deputy testified that he smelled alcohol on appellant's breath when he arrested him and believed felt that appellant knew exactly what he was doing. Dr. Clay Griffith, a psychiatrist, performed a competency examination of appellant. Dr. Griffith then testified that in his opinion appellant was not insane on July 27, 1980, was not a paranoid schizophrenic, and was definitely in touch with reality.

We note that Judge Baird's concurring opinion in this case expresses concern that the prosecutor's argument referencing the extraneous offenses implies that, since appellant made threats against Parsons but did not carry them out, he was, therefore, sane. *Abdnor*, 808 S.W.2d at 479. We conclude that the context in which the State used Parsons' testimony relating to the extraneous offenses does not permit the testimony, by implication, to be drawn into the larger issue of sanity. The evidence of the offenses was used only to respond to the cross-examination and argument of defense counsel. Further, no expert testimony was elicited by either the prosecution or the defense that would lead to a jury concluding that only a sane person threatens others and then does not carry out the threat.

We conclude that the properly admitted, but erroneously unlimited, evidence of extraneous offenses caused no actual harm to appellant. We overrule appellant's point of error and affirm the judgment of the trial court.

KAPLAN, J., dissents and files opinion.

KAPLAN, Justice, dissenting.

I respectfully dissent. I refuse to follow the majority's strained analysis and myopic review of the record in order to reach the desired result that appellant suffered no harm in this case.

John Howard Abdnor shot and killed Janice Ballew. The only issue at trial involved appellant's sanity at the time the offense was committed. The majority concedes that this issue was heavily disputed. The trial court erred in failing to give a limiting instruction on the use of extraneous offense evidence. We must therefore determine whether this error harmed appellant in light of his insanity defense. I conclude that appellant suffered some harm.

## RELEVANT TESTIMONY

Lowell Bryan Parsons testified for the State. He told the jury about a telephone conversation with appellant two days before Janice Ballew was murdered. Parsons said that appellant was "mad as hell" that he and Ballew had broken up. He quoted appellant as saying, "[t]hat b___ really screwed up this time ... if she walked through that door right now, I'd blow her head off. I'd just blow her right up against the wall."

On cross-examination, appellant's counsel impeached Parsons with a prior inconsistent statement made just days before trial. Parsons admitted that he told the prosecutor that he had lied about the telephone conversation with appellant.

The State attempted to rehabilitate Parsons on re-direct. Parsons testified that he recanted his previous statement about the telephone conversation because he was afraid of appellant. Specifically, Parsons said that "[appellant] had previously pulled a knife on me." He also stated that Mike Durand told him that "[appellant] had called and said he was going to take a .45 and bring it over to blow my head off."

The prosecutor called the jury's attention to this extraneous offense testimony during closing argument. He also argued that "[Parsons] told you that the defendant knew the difference between right and wrong, and could conform his conduct to the requirements of the law, if he wanted to. He just wouldn't."

## HARM ANALYSIS

### 1. Preservation of Error

Appellant objected to Parsons' testimony. He also requested a limiting instruction on the use of this extraneous offense evidence. Specifically, appellant asked the trial court to instruct the jury "that the testimony is admitted only for the purposes of how it affects the credibility of the witness, and it's not to be considered for any purpose whatsoever as to whether or not the defendant is guilty of the offense charged." The trial court refused to give a limiting instruction at trial or in the jury charge. Appellant timely objected to the charge.

### 2. Applicable Law

We must reverse the trial court's judgment if the error in the charge was calculated to injure the rights of appellant. TEX. CODE CRIM.PROC.ANN. art. 36.19 (Vernon 1981); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985). We examine the entire record to determine whether appellant suffered some harm as a result of this error. *Arline v. State*, 721 S.W.2d 348, 352 (Tex.Crim.App.1986). The actual degree of harm must be assessed in light of (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the argument of counsel; and (4) any other information revealed by the record as a whole. *Almanza*, 686 S.W.2d at 171. If an appellant properly preserves error in a jury charge, *any* harm requires reversal. *Gibson v. State*, 726 S.W.2d 129, 133 (Tex. Crim.App.1987) (emphasis in original).

### 3. Application of Law to the Facts

I cannot conclude that the trial court's failure to give a limiting instruction in this case was harmless error. First, there is a greater prejudicial effect from the admission of criminal extraneous conduct than noncriminal conduct. *Plante v. State*, 692 S.W.2d 487, 490 n. 3 (Tex.Crim.App.1985). Parsons' testimony that appellant threatened him with a knife and gun on two

previous occasions constituted criminal extraneous conduct. *See Abdnor v. State,* 808 S.W.2d 476, 479 (Tex.Crim.App.1991) (Baird, J., concurring and dissenting).

Second, appellant raised the affirmative defense of insanity. This issue was hotly contested at trial. Parsons' testimony about appellant's prior threats and violent behavior was necessary to explain the reasons he recanted the statement given to the prosecutor. However, the jury could also infer that because appellant did not actually harm Parsons, he knew the difference between right and wrong. *See Abdnor,* 808 S.W.2d at 479. The prosecutor mentioned the extraneous offense involving the knife during closing argument, but did not limit the argument to Parsons' credibility. Instead, the prosecutor reminded the jury of Parsons' earlier testimony that appellant could conform his behavior to the requirements of the law if he wanted to.

The majority's quantitative analysis of the record is misplaced. It matters little that Parsons' testimony concerning the extraneous offenses takes up a relatively small part of the record. The evidence came from a witness whose testimony was pivotal to the State's claim that appellant was not insane. While other witnesses may have been able to testify about appellant's cognitive abilities, Parsons was the only witness who testified at any length about appellant's state of mind at the time of the offense. The jury would likely place more emphasis on Parsons' testimony than similar evidence from other sources.

The killing was both senseless and brutal. The evidence is clear that appellant committed the offense. However, the trial court's refusal to include a limiting instruction in the charge enabled the jury to determine that appellant was sane at the time of the shooting because he had previously threatened but not harmed Parsons. I would hold that appellant suffered some harm. *Abdnor,* 808 S.W.2d at 479.

I would reverse the judgment of the trial court and remand the case for a new trial.