**Horencio Fernandez SAENZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 1205–90.**

Court of Criminal Appeals of Texas, En Banc.

Nov. 25, 1992.

Mary E. Conn, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and J. Harvey Hudson, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

OVERSTREET, Judge.

Appellant was charged by indictment with the offense of possession of less that 28 grams of cocaine, alleged to have occurred on or about November 26, 1985. On September 18, 1986 in the 177th Judicial District Court of Harris County, appellant was found guilty by a jury and sentenced by the court to "eight years confinement in the state penitentiary."[1] We granted appellant's sole ground for review which averred, "The Court of Appeals erred in holding that the admission of testimony about an uncharged sale of cocaine at a location different from the location where the offense charged occurred was not an extraneous offense, and thus finding it admissible."

### I.

#### SUMMARY OF PERTINENT FACTS

The record reveals that on November 26, 1985, officers of the Pasadena Police Department executed a search warrant at a particular apartment. Appellant had been observed previously entering and exiting that apartment. On the day that the warrant was executed, he was also observed entering and exiting the apartment. He was shortly thereafter stopped and taken into custody on a driveway at the complex and returned to the apartment where the warrant was being executed. When he was arrested, certain currency was recovered from his pocket. At that apartment a substance determined to be cocaine was discovered. Also, a Houston Lighting & Power Company bill and a Texas Vehicle Registration were found there, both of which were addressed to appellant, but at two different addresses in La Porte, Texas.

Testimony indicated that the currency recovered from appellant belonged to the Pasadena Police Department. This money had been given "to a subject" earlier that same day. The testifying officer had last seen the money "less than an hour" before appellant was arrested and the money recovered. That this was the same money was verified by comparing it to previously made photocopies. The officer also testified that he "recovered a quarter ounce of cocaine." It is very unclear from whom or from where this quarter ounce was recovered.[2] An exhibit was later marked and identified as "a quarter ounce of cocaine" but no testimony ever specifically described wherefrom it came, nor was it ever actually introduced into evidence.[3] Appellant vigorously and repeatedly objected to the above-described testimony regarding the money based upon such being collateral extraneous matter, extraneous offenses, and that the prejudicial effect would outweigh any probative value. He even sought and received "a running objection to [that] line of testimony."

1. We note that the transcript does not contain a copy of a judgment or sentence. However, we are able to discern the above-detailed information from the statement of facts and such does correspond with the parties' allegations.

2. The majority and dissenting opinions from the Fourteenth Court of Appeals and the State's and appellant's briefs all concur that it is very difficult to discern from where this mysterious quarter ounce came. It would seem to have been recovered from either appellant, the above-mentioned subject, or some other subject. It does not appear to have been recovered from the apartment which was searched.

3. The prosecutor did argue to the jury that the officer said that he "met with the subject. And his testimony was, what did you get? I got a fourth of an ounce of cocaine." Later in argument she exhorted the jury to find that "what he [appellant] had on him was cocaine."

## II.

## APPELLANT'S CLAIM

Appellant claims on appeal that the above-described testimony indicated that prior to his arrest he had met with "the subject" and somehow acquired marked police money while "the subject" acquired cocaine and that such was inadmissible extraneous offense evidence, specifically of a prior drug purchase/sale. The State responded that the recovery of the money from appellant does not, in and of itself, constitute evidence of an extraneous offense, and if the recovery of such money is not connected to an extraneous offense then such is an irrelevant detail which is neither probative of any issue in the case nor prejudicial to appellant. The State also claims that appellant's sale of cocaine to an undercover agent a short time before the execution of the search warrant would seem to irrefutably link appellant to the contraband found in the apartment, thus such evidence was admissible and the trial court erred in limiting the testimony to vague references of "marked" money rather than permitting the State to introduce every detail of the extraneous drug sale.

The Fourteenth Court of Appeals disagreed with appellant's extraneous offense claim. *Fernandez Saenz v. State*, 802 S.W.2d 765, 766 (Tex.App.—Houston [14th Dist.] 1990). It held that the trial court did not err in admitting the evidence, ostensibly because such was "probative evidence linking appellant to the contraband found in the apartment." *Id.* at 767.

## III.

## EXTRANEOUS OFFENSE ANALYSIS

 In *Montgomery v. State*, 810 S.W.2d 372 (Tex.Cr.App.1991) (Opinion on

Rehearing), we recently explicitly detailed the proper analysis of extraneous offense evidence, at both the trial and appellate levels, per Article IV of the Texas Rules of Criminal Evidence.[4] Without belaboring the canons explicated in *Montgomery*, suffice it to say that after appropriate objections, to be admissible, extraneous offense evidence must be relevant apart from supporting an inference of character conformity and such evidence's probative value must not be substantially outweighed by the danger of unfair prejudice or other negative attributes (e.g. confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence). We review a trial court's actions regarding the admissibility of such evidence under an abuse of discretion standard.

Appellant's above-noted objections were quite sufficient to properly bring his complaint to the trial court's attention. The record does not reflect that there was any discussion or argument by the State in favor of the challenged evidence, although as the witness first mentioned recovering money, appellant requested a bench conference, whereupon an unrecited "[o]ff-the-record discussion" took place. The trial court simply overruled appellant's objections.[5]

 Appellant's complaint relates to "testimony about an uncharged sale of cocaine at a location different from the location where the offense charged occurred;" i.e. that appellant's possession of "marked" money coupled with the testimony about the recovery of the mysterious "quarter ounce of cocaine" insinuated that he had acquired that money by somehow being

**4.** We note that these rules are applicable to the case at bar, in spite of the date on which the offense was alleged to have occurred, because the trial took place after September 1, 1986, the effective date of said rules. See *Willard v. State*, 719 S.W.2d 595, 601 (Tex.Cr.App.1986).

**5.** We do note that when the jury was removed after an earlier objection, there were discussions about the State attempting to establish probable cause for issuance of the search warrant. While the trial court indicated that it did

not want to get "hung up on something that may have occurred prior to the issue [sic] of the search warrant," the State argued that those other facts which led up to the execution of the warrant "go[es] into the probative value of it in that [appellant's] involvement in something, that involvement with [the testifying officer] and the drug transaction prior to that, that is very substantial and very probative to the case" and that such occurred on the same day.

involved in a cocaine sale. The State now claims that such an inference was properly placed in evidence before the jury to prove the requisite affirmative link to the contraband recovered in the apartment. As such an inference could certainly logically provide such a link, we conclude that by reasonable perception of logic and common experience the trial court could have reasonably concluded that the challenged evidence served some purpose other than character conformity; therefore there was no abuse of discretion in finding such. *Montgomery v. State*, 810 S.W.2d at 391; Tex.R.Crim.Evid. 404(b). So after concluding that there was no error in the trial court's implied finding that the challenged evidence had relevance apart from character conformity, we must now decide whether there was any abuse of discretion in admitting the evidence in light of appellant's objection "that the prejudicial effect would outweigh any probative value."

We have stated that evidence of other crimes, wrongs, or acts may create "unfair prejudice" if under the circumstances a jury would be more likely to draw an impermissible character conformity inference than the permissible inference for which the evidence is relevant, or if it otherwise distracts the jury from the specifically charged offense and invites them to convict on a moral or emotional basis rather than as a reasoned response to the relevant evidence. *Montgomery v. State*, 810 S.W.2d at 395. We must also make an inquiry into the State's need for the evidence. *Id.*

The State claims that it needed the evidence to provide an affirmative link between appellant and the cocaine found in the apartment. The record reflects that the previously mentioned vehicle registration and electric service bill indicate out-of-town addresses for appellant, though both appear to be for periods prior to November of 1985.[6] The cocaine was recovered from the same bedroom as were the registration and electric service bill. The cocaine was found in several small clear plastic bags in a quantity of "residue and small amounts of white powder." The lab report and examination sheet indicate that the total combined weight of the cocaine recovered in the apartment was .30016 grams. (These were in separate quantities of .2308, .0686, .00007, .00009, and .00060 grams respectively.)[7] Drug paraphernalia, specifically hemostats, pipes, plastic glass, and a cigarette roller, was also found in the apartment. Some of the paraphernalia was recovered in the previously mentioned bedroom while some was found in the living room area. Additionally, a straw, funnel, glass tube, and razor blades, all of which contained white powder residue, were recovered from "various parts of the [previously mentioned] bedroom and the living room." A set of weights to a scale was also recovered. The officer testified that the above-described paraphernalia was not examined and tested for fingerprints.

The officer admitted that he did not know how long the cocaine had been in the apartment or who had brought it there. He also admitted that he had never seen appellant in any bedroom in the apartment nor in possession of or using any of the paraphernalia. He did testify that he had observed appellant at that apartment "probably four or five times" during surveillance and saw him entering it "maybe two or three times," and on at least one occasion using a key. He also testified that a woman and a two-year-old boy were present during the search, and that that woman and another woman who was not present were named on the lease agreement for that apartment. As stated previously appellant was arrested outside the apartment.

We observe that the probative value of the complained of testimony, i.e. that re-

---

6. The vehicle registration lists the date issued as "7–13–84" and indicates that it expired on the last day of June 1985. The Houston Lighting & Power Company bill indicates that it is a "final bill" for service at an unspecified former address and denotes a billing date of "Oct[.] 1, 1985" with a past due date of "Oct[.] 1."

7. The report also indicates that 5.62 grams of cocaine was also analyzed by the lab; however that cocaine was never admitted into evidence and would appear to be the mysterious "quarter ounce" that the officer testified to recovering without specifying wherefrom.

garding appellant's possession of the "marked" money, was rather low, particularly in light of the fact that the State never did explicitly connect appellant to a drug sale. As appellant avers, it appears that that connection was made by way of innuendo in that appellant possessed the "marked" money which was somehow related to the previously mentioned "quarter ounce of cocaine" which was recovered from parts unknown. While this innuendo evidence could logically provide an affirmative link between appellant and the cocaine found at the apartment, such link would be quite tenuous, and such was not very probative of whether appellant intentionally or knowingly possessed the cocaine found at the apartment. We therefore conclude that said evidence as presented had a very low probative value.

It goes without saying that insinuated involvement in an exchange of money involving a "quarter ounce of cocaine" would be prejudicial to a person standing trial for possession of a controlled substance. Such prejudice would appear to envelop the accused regardless of the degree of specificity to which it was proven that he was involved in such a transaction. If there was no clear showing of the accused's involvement in such, it could be said that such prejudice was unfair. We conclude that the State's use of the challenged evidence without specifically connecting appellant to the inferred drug sale was unfairly prejudicial.

We also consider whether there was confusion of the issues or misleading of the jury in admitting the challenged evidence. We observe that there does appear to have been quite a bit of confusion engendered by the admission of the challenged evidence and the circumstances of appellant's acquisition of the "marked" money were never explained. The prosecutor evidenced some confusion in that she argued to the jury that appellant had cocaine "on him," yet the primary thrust of her arguments was that appellant was affirmatively linked to the cocaine found in the apartment. We also observe that the court of appeals' majority opinion at one point construed the evidence such that it indicated that the "quarter ounce of cocaine" was recovered

from the anonymous "subject," yet later held that there was no error in allowing the State to argue that such was recovered from appellant. *Fernandez Saenz v. State*, 802 S.W.2d at 766 and 768. This confusion surrounding the challenged "marked" money evidence did have a tendency to mislead the jury.

■ Where relevant criteria, viewed as objectively as possible, lead to the conclusion that the danger of unfair prejudice substantially outweighed the probative value of the challenged evidence, we must declare that the trial court erred in failing to exclude it. *Montgomery v. State*, 810 S.W.2d at 395. We conclude that the probative value of the evidence was substantially outweighed, thus the evidence was inadmissible and the trial court erred and abused its discretion in failing to exclude it. Tex.R.Crim.Evid. 403.

We therefore reverse the judgment of the court of appeals and remand this cause to that court to conduct a harm analysis pursuant to Tex.R.App.Proc. 81(b)(2).

CLINTON, Judge, concurring.

I

The majority adopts a view of the evidence shared by the dissenting opinion below, *viz:* that it does not indicate the source of the "quarter ounce of cocaine." Nevertheless, upon what appears to be the State's wishful thinking, and without any analysis, the majority concludes this evidence has some relevance to show an affirmative link between appellant and the contraband found in the apartment. Thus the majority concludes "that by reasonable perception of logic and common experience the trial court could have reasonably concluded that the challenged evidence served some purpose other than character conformity[.]" Majority Op. at 27. With deference, I must disagree.

To have any tendency to connect appellant to the cocaine recovered in the apartment, evidence of the "quarter ounce of cocaine" would have to show not only that appellant sold it, but that it came from within the apartment. That appellant had the marked money in his possession is some evidence he received it at some time

within an hour of his arrest. We may infer he received it from the "subject" to whom the testifying officer had given it. But the evidence does not show for what, if anything, the money was given to appellant. That a quarter ounce of cocaine was recovered later from an undisclosed source does not establish, even tenuously, that appellant sold it to the "subject" to whom the testifying officer had given the marked money. Without knowing the source of the quarter ounce of cocaine, we cannot make any rational inference connecting it to appellant or the apartment. It has no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without" it. Tex.R.Cr. Evid., Rule 401. Relevant to this prosecution, it proves nothing at all. It is not even character conformity evidence. Its probative value is not "low." Majority Op. at 28. It is nil.

For this reason I conclude the evidence is not relevant under Rule 401, and hence, is subject to objection under Tex.R.Cr.Evid., Rule 402. The trial court erred to overrule appellant's objection that it was an "extraneous matter." *Montgomery v. State*, 810 S.W.2d 372, at 387 (Tex.Cr.App.1991) (Opinion on rehearing on Court's own motion). Of course, because the evidence had no probative value at all, I agree with the majority that "its probative value is substantially outweighed by the danger of un-

fair prejudice," etc. Tex.R.Cr.Evid., Rule 403. We need not go so far to resolve this cause, however.

## II

I also agree with the majority that we should remand the cause for assessment of harmfulness, *vel non*, in the court of appeals. Tex.R.App.Proc., Rule 81(b)(2). Because we are a discretionary review court, and not, in this context, "the appellate court," *id.*, we should not resolve the issue of harmfulness as a matter of first impression. Consistent with my persistent insistences that the respective constitutional roles of our courts of appeals and of this Court be preserved in practice,* I would leave the question of harm to the court of appeals to resolve on remand, subject to our discretionary review. See also *Gipson v. State*, 844 S.W.2d 738 (Tex.Cr.App.1992) (Benavides, J., concurring, Part IIA).

BENAVIDES, J., joins.

CAMPBELL, J., joins part II.

## CONCURRING AND DISSENTING OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

McCORMICK, Presiding Judge, concurring and dissenting.

I do not agree that the admission of the complained of evidence was error, but be-

---

* After 1981 a common understanding of the proper constitutional review function of this Court *vis-a-vis* jurisdiction and authority on direct appeal of courts of appeals evolved as competing views on related matters were developed and ultimately resolved. Below is a chronological sampling of illustrative cases, e.g.:

*Turner v. State*, 662 S.W.2d 357, at 358, 362 (Tex.Cr.App.1984) (dissenting opinion);

*Lambrecht v. State*, 681 S.W.2d 614, at 616 (Tex. Cr.App.1984);

*Dugard v. State*, 688 S.W.2d 524, at 532–534 (Tex.Cr.App.1985) (Clinton, J., dissenting opinion) (adopted in *Williams v. State*, 780 S.W.2d 802 (Tex.Cr.App.1989));

*Laday v. State*, 685 S.W.2d 651, at 652–654 (Tex. Cr.App.1985) (concurring and dissenting opinions);

*Chambers v. State*, 711 S.W.2d 240, at 252–253 (Tex.Cr.App.1986) (concurring opinion);

*Degrate v. State*, 712 S.W.2d 755 (Tex.Cr.App. 1986);

*McElroy v. State*, 720 S.W.2d 490, at 495–496 (Tex.Cr.App.1986) (concurring opinion);

*Tallant v. State*, 742 S.W.2d 292 (Tex.Cr.App. 1987);

*Meshell v. State*, 739 S.W.2d 246, at 258–260 (Tex.Cr.App.1987) (dissenting opinion);

*Schwerdtfeger v. State*, 749 S.W.2d 781, at 782–784 (Tex.Cr.App.1988) (dissenting opinion);

*Jefferson v. State*, 751 S.W.2d 502, at 503–504 (Tex.Cr.App.1988) (dissenting opinions);

*Juarez v. State*, 758 S.W.2d 772, 784–785 (Tex.Cr. App.1988) (dissenting opinion);

*Johnson v. State*, 760 S.W.2d 277, at 278, n. 2 (Tex.Cr.App.1988);

*Bynum v. State*, 767 S.W.2d 769, at 776 (Tex.Cr. App.1989);

*Leal v. State*, 773 S.W.2d 296, at 297 (Tex.Cr. App.1989);

*Lee v. State*, 791 S.W.2d 141 (Tex.Cr.App.1990);

*Holland v. State*, 802 S.W.2d 696, at 698–701 (Tex.Cr.App.1991).

lieve the Court of Appeals was correct in its disposition. I, therefore, dissent to the finding of error.

However, for the reasons set forth in Part II of Judge Clinton's concurring opinion, I concur in the remand to the Court of Appeals for assessment of harm, if any.

J. WHITE joins this concurring and dissenting opinion.

BAIRD, Judge, concurring in part and dissenting in part.

I join all but the final paragraph of the majority opinion and dissent to the remand of this cause. For the following reasons, I feel we should perform the harm analysis.

## I.

The plain language of Tex.R.App.Proc. Rule 81(b)(2) requires the "appellate court" to perform the harm analysis. Rule 81(b)(2) provides:

> If the appellate record in a criminal case reveals error in the proceedings below, the *appellate court* shall reverse the judgment under review, unless the *appellate court* determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.[1]

The Court of Criminal Appeals is an appellate court under our rules, our Constitution and in the common parlance of that term. Tex.R.App.Proc. Rule 3 provides: " ... 'Appellate court' includes the courts of appeals, the Supreme Court and *the Court of Criminal Appeals.*"

Further, this Court is an appellate court under the Constitution. Art. V, § 5 provides: "The Court of Criminal Appeals shall have final *appellate* jurisdiction coextensive with the limits of the state...."

Finally, this Court meets the definition of an appellate court as defined by Black's Law Dictionary 50 (5th ed. 1983).

> A court having jurisdiction of appeal and review; a court to which causes are removable by appeal, certiorari, error or report. A reviewing court, and, except

in special cases where original jurisdiction is conferred, not a "trial court" or a court of first instance.

As this Court is an appellate court, we are required to perform a harm analysis pursuant to Rule 81(b)(2) when we find error.

## II.

Some argue, in support of a remand, that the court of appeals did not render a "decision" on the issue of harm, therefore, there is no decision for this Court to review. This argument is without merit. A harm analysis is an integral, nondivisible part of the determination of error. As Judge Overstreet correctly noted in *Miller v. State,* 815 S.W.2d 582, 585 n. 2 (Tex.Cr. App.1991), "harm is always an issue properly before this Court whenever error is discovered." Consequently, we should not prematurely end our review with the determination of error and remand the case to the court of appeals.

There is no legitimate reason for remanding a case for a harm analysis when the court of appeals failed to recognize the error in the first instance. And it is unrealistic to expect the dictates of Rule 81(b)(2) to be fully realized by a court that failed to recognize error initially because the court of appeals implicitly found no harm by determining there was no error.

Moreover, we do not preempt the court of appeals when we perform a harm analysis. Tex.R.App.Proc.Rule 202(a) provides: "The Court of Criminal Appeals may review a *decision* of a court of appeals in a criminal case upon petition by the appellant or the State." Black's Law Dictionary 494–5 (5th ed. 1983) defines a decision as

> A determination arrived at after consideration of the facts, and, in legal context, law. A popular rather than technical or legal word; a comprehensive term having no fixed, legal meaning.

Perhaps because there is no fixed legal meaning of what constitutes a "decision," we have been less than consistent in our treatment of the cases where we found

---

1. Unless otherwise indicated, all emphasis herein is supplied by the author.

error after the court of appeals initially made a "no error" determination. There have been any number of cases where this Court performed a harm analysis in the first instance. In *Gauldin v. State*, 683 S.W.2d 411 (Tex.Cr.App.1984), we conducted a harmless error analysis on an issue that had previously been rejected by the Court of Appeals. Presiding Judge McCormick, writing for the majority, said, "Having concluded that the evidence was unconstitutionally obtained, we must now determine whether its introduction was sufficiently prejudicial to appellant so as to require reversal." *Id.* at 415.

In *Castillo v. State*, 810 S.W.2d 180 (Tex.Cr.App.1990), we determined the Court of Appeals erroneously concluded the trial court properly admitted a wiretapped conversation. However, Judge Campbell proceeded to conduct the harmless error analysis in the first instance:

> We must now determine whether the admission of the April 13, 1987, conversation constituted reversible error. Rule 81(b)(2) of the Texas Rules of Appellate Procedure provides that an appellate court in a criminal case need not "reverse the judgment under review [if] the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or the punishment."

*Id.* at 184.

In *Fullbright v. State*, 818 S.W.2d 808, 810 (Tex.Cr.App.1991), we said:

> The determination that the trial court erred by denying appellant's motion to quash the enhancement paragraph does not conclude our examination of the case; we must now conduct a "harmless error analysis" pursuant to Rule 81(b)(2) Tex. R.App.P. ...

These cases are but three examples of the many cases where this Court has conducted the harm analysis in the first instance.[2]

Even the United States Supreme Court does not remand every case to the courts of appeals for a harmless error analysis: "Although we are not required to review records to evaluate a harmless-error claim, and do so sparingly, we plainly have the authority to do so." *United States v. Hasting*, 461 U.S. 499, 510, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983). In *Hasting*, the Court noted, "[s]ince this Court has before it the same record the Court of Appeals reviewed, we are in precisely the position of that court in addressing the issue of harmless error." *Id.* at 510, n. 8, 103 S.Ct. at 1981, n. 8. The Supreme Court also performed a harm analysis in the first instance in *United States v. Lane et al.*, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), *and Yates v. Evatt*, —— U.S. ——, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991).

### III.

Finally, remanding cases for a harm analysis is an illusory display of respect and a meaningless squandering of judicial resources that our over-burdened appellate court system can ill afford. When we remand a case for a harmless error analysis we are certain to see the case again by way of a subsequent petition for discretionary review. That petition will require additional briefing by the parties, review by the staff of this Court, and the time and attention of the individual members of this Court, further exhausting our limited resources.

The problems inherent in remanding cases for a harm analysis were given succinct and forceful expression in *Woodfox v. State*, 742 S.W.2d 408, 412–3 (Tex.Cr.App. 1987) (Onion, P.J., dissenting):

> I find it ridiculous to remand this cause to the Court of Appeals, keep this cause in the heavenly appellate orbit, delay the finality of the judgment, further exhaust judicial resources, the State's money, and insure, in all likelihood that we will once again be able to open up the

---

2. There are many cases in which this Court has done the harmless error analysis in the first instance, e.g., *London v. State*, 739 S.W.2d 842 (Tex.Cr.App.1987); *Brown v. State*, 757 S.W.2d 739 (Tex.Cr.App.1988); *McGary v. State*, 750 S.W.2d 782 (Tex.Cr.App.1988); *Webb v. State*,

766 S.W.2d 236 (Tex.Cr.App.1989); *Jamail v. State*, 787 S.W.2d 380 (Tex.Cr.App.1990); *Brewington v. State*, 802 S.W.2d 691 (Tex.Cr.App. 1991); *Ramirez v. State*, 802 S.W.2d 674 (Tex.Cr. App.1991); *Anderson v. State*, 817 S.W.2d 69, 72 (Tex.Cr.App.1991).

same appellate record and find ourselves right where we are today.

An example of the time consumed in appellate orbit appeared in *Jones v. State,* 720 S.W.2d 535, 536 (Tex.Cr.App.1986) (Onion, P.J., dissenting):

> The record discloses that this offense occurred on August 28, 1980. The indictment was returned on October 2, 1980. Trial commenced on April 26, 1982. After conviction, notice of appeal was given on June 18, 1982. The record reached the Court of Appeals on October 7, 1983. On May 15, 1985, the Court of Appeals handed down its opinion affirming the conviction. In connection with the said opinion the record reached the Court of Criminal Appeals on July 10, 1985. The said petition was originally refused on April 30, 1986, but appellant's motion for rehearing and petition were granted on June 18, 1986. The cause was submitted on November 12, 1986. Now, over six years after the alleged murder offense, the majority is returning the cause to the Court of Appeals for another appellate round with every likelihood that another round will be had in this Court before any gong is sounded, if then.

Perhaps the most extreme example of the time consumed in appellate orbit was seen in *Abdnor v. State,* 808 S.W.2d 476 (Tex.Cr.App.1991):

> Appellant was convicted in 1981. His original appeal seeking to establish indigency took five years. *Abdnor v. State,* 712 S.W.2d 136 (Tex.Cr.App.1986). His direct appeal on the merits was not resolved until 1988. *Abdnor v. State,* 756 S.W.2d 815 (Tex.App.—Dallas 1988). This case has been pending before this Court since that time. Today, the majority remands the cause for the Court of Appeals to conduct a harmless error analysis.
>
> I believe justice would be better served if we conducted such an analysis instead of remanding this cause to the Court of Appeals....
>
> ... while I believe, for the reasons stated above, the Court of Appeals will

find harm pursuant to *Almanza* [*v. State* ], 686 S.W.2d 157 [ (Tex.Cr.App. 1984) ], in the event the Court of Appeals does not, we will certainly be called upon to address the remaining two grounds for review, and the disposition of the harm analysis pursuant to this remand. This would result in even greater appellate delay when such can be prevented by this Court at this time.

*Abdnor v. State,* 808 S.W.2d 476, 478–9 (Tex.Cr.App.1991) (Baird, J., concurring in part and dissenting in part). Although *Abdnor* was remanded to the Court of Appeals on May 15, 1991, a harm analysis was not performed until October 9, 1992. *See, Abdnor v. State,* 845 S.W.2d 302 (Tex. App.—Dallas 1992).

Remanding cases to the courts of appeals for a harmless error analysis is a judicial luxury that our overburdened appellate court system simply cannot afford. The courts of appeals are asked to resolve approximately 8,500 cases each year.[3] Rather than add to that number by remanding cases, we should address the issue of harm when we determine the court of appeals erroneously determined there was "no error." Typically, we can conduct a harm analysis in relatively short order. Therefore, the harm analysis is not taxing when performed by this Court.

I do not advocate this position in order to usurp the authority of the courts of appeals, but because I feel that *all* of our judicial resources, including those of the courts of appeals, can be put to better use if this Court addresses the harm issue while the record is familiar to us and the issues are fresh. By consistently performing the harm analysis, we would eliminate the problem of "appellate orbit," conserve judicial resources, and promote the finality of judgments.

For these reasons, I dissent to the remand of this cause to the Court of Appeals.

---

**3.** *Texas Judicial System, Annual Report,* State Fiscal Year 1991, Office of Court Administration, states the total number of new cases filed during the fiscal year 1991 was 8,563.