NUMBER 13-00-474-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

__________________________________________________________________


JUAN HERNANDEZ, JR. , Appellant,


v.


THE STATE OF TEXAS , Appellee.

__________________________________________________________________


On appeal from the 24th District Court

of Jackson County, Texas.

__________________________________________________________________


O P I N I O N

Before Justices Dorsey, Hinojosa, and Castillo

Opinion by Justice Dorsey


A jury convicted appellant, Juan Hernandez, Jr., a former Refugio County deputy sheriff, of felony theft while a public
servant and misapplication of public funds by a fiduciary. (1) The essence of the allegations was that appellant stole
approximately $100,000 cash from the Refugio County Sheriff's Department. The money was part of a very large sum of
drug related currency the department had seized as the result of a traffic stop. The jury sentenced him to ten years
imprisonment and appellant appealed his conviction and sentence to this Court. In an unpublished opinion we affirmed the
conviction, but held error had been committed at the punishment hearing, in that evidence of two other thefts that had not
resulted in a final conviction had been admitted, without the necessary quantum of evidence to prove him guilty of these
extraneous convictions beyond a reasonable doubt. We remanded the case to the trial court for a new trial on the issue of
punishment. Hernandez v. State, No. 13-96-643-CR, (Tex. App.-Corpus Christi 1999, pet. ref'd).

The matter of punishment only was retried in July, 2000, before a jury, with the result that appellant was sentenced to 80
years confinement rather than the 10 years ordered at the earlier trial. The state produced much more detailed evidence of
an extraneous offense at the most recent punishment hearing. Appellant appeals by three issues, claiming the punishment
was "vindictive" as additional penalty for appealing his first conviction, that the extraneous crime was not proven beyond a
reasonable doubt, and the state improperly commented on his post-arrest silence. We overrule the issues and affirm.

I. Evidence at the Sentencing Hearing

The State offered evidence of appellant's involvement in a prior unadjudicated offense: theft of approximately $404,000 of
seized drug money. The State's chief witness at the punishment hearing was Jesse Cevallos, who in 1992, worked as a
money launderer for the Juan Garcia Abrega (2) drug family. The Abrega Family was headquartered in Mexico and was one
of the world's largest drug families. 

Cevallos was serving a term in federal prison for money laundering at the time of his testimony. Cevallos's job was to count
large sums of cash received from drug transactions and then transport it by car from the United States to the Abrega Family
in Mexico. Cevallos frequently used Hugo Almendarez to drive the money-ladened vehicles to Mexico. On January 31,
1992, a member of the Abrega Family brought drug money to Cevallos's Houston residence. Cevallos and Almendarez
used a machine to count the money which totaled $1 million. Cevallos put the money into two duffle bags and then put
them into a car which Almendarez was going to drive to the Abrega Family in Mexico. Before Almendarez left with the
money Cevallos told the Abrega Family that Almendarez was taking $1 million to them. Cevallos testified that
Almendarez knew that he had called the Abrega Family and that Almendarez also knew that if he delivered less than $1
million, the Abrega Family would kill him. Almendarez and two female passengers (3) left for Mexico with the money.

Larry Greene, an FBI agent, testified that the FBI received a tip that this money was being transported to Mexico in a blue
car. The FBI advised all law-enforcement agencies in the region to be on the lookout for a blue car with a certain license
number, carrying a large amount of cash.

Roy Cisneros, a Refugio County deputy sheriff, testified that he and a civilian passenger, Sammy Jaramillo, were on patrol
when they received the "be on the lookout" alert (BOLO). Cisneros stated that appellant called him on his mobile phone
and asked if he had received the BOLO. Cisneros told him that he did, and appellant told him not to broadcast anything
over the radio. A short time later appellant again called Cisneros on his mobile phone and told him that he was behind the
suspect vehicle, a blue Beretta, and that he wanted Cisneros to make the stop. Cisneros stopped the Beretta and saw that
Almendarez and two female passengers were in the car. Appellant and Ronald Escamilla, a Refugio County jailer who was
riding with appellant, arrived at the scene. Almendarez gave appellant consent to search the car, and appellant found the
two duffle bags in the trunk. Cisneros searched the car's interior and found a purse containing money. Appellant put the
duffle bags and purse into his vehicle and ordered Jaramillo to drive the Beretta with the two females to the sheriff's office. 
Appellant ordered Cisneros to drive Almendarez to the sheriff's office in his patrol car. Appellant ordered Cisneros and
Jaramillo to leave, and they left appellant and Escamilla at the scene. Appellant's orders violated standard operating
procedure. Cisneros testified that the money should have stayed in the Beretta and that he should have driven the Beretta to
the sheriff's office.

Cisneros testified that appellant and Escamilla arrived at the sheriff's office five minutes after he did. They took the money
inside where Cisneros and several others counted it by hand. When they finished Refugio County Sheriff Jim Hodges gave
the money and a receipt to Larry Greene, an FBI agent. The receipt showed that they had counted $597,995. Almendarez,
the arrested driver, also received a receipt for the same amount. Cisneros watched the money from the time appellant and
Escamilla brought it into the office until the time Greene took control of it. Cisneros did not see anyone take any money.

Agent Greene testified that he took the money to a Houston bank where it was counted by machine. The bank's count
totaled $596,466.

Cevallos testified that after the seizure he and Almendarez met with the Abrega Family. The Abrega Family had
Almendarez interrogated (4) about the missing $404,000 ($1,000,000 - $596,466). Cevallos's testimony was that although
Almendarez took "a licking" from the interrogators, they were "completely satisfied" that Almendarez did not steal the
$404,000. Cevallos had to pay the Abrega Family $400,000 to make good the loss. He would not have paid them the
money if he had thought that Almendarez stole it.

On cross-examination appellant's counsel asked Cevallos:

Q. Now, your position is that you believe Mr. Hernandez [appellant] stole the money from you?

A. I couldn't say he did because I don't know the man. The only thing I can tell you, when Hugo was interrogated and the
reason that the people from Mexico was completely satisfied was because he kept saying that the only one that could have
taken the money was the officer who stopped him at Refugio, Texas.
Agent Greene supported Cevallos's testimony. Greene testified that after the money was seized the FBI's investigation
showed that Cevallos went to Mexico to answer for the lost money.

Refugio County Sheriff Jim Hodges testified that appellant's gross salary for 1991 was $19,780, for 1992, his gross salary
was $21,380, and for 1993, his gross salary was "a little over $22,000." Hodges said that from March 18, 1992 to March
24, 1992 appellant went to Paris Island, South Carolina, to see his sister graduate from the Marine Corps. From December
24, 1992 to January 5, 1993 appellant took his family of five to Hawaii. From April 10, 1993 through April 18, 1993, they
went skiing at Red River, New Mexico. The seizure of the Abrega family's drug money was in February 1992.

II. Vindictive Punishment

By his first issue appellant asserts that he was denied due process of law under the Fourth and Fourteenth Amendments to
the U.S. Constitution because the State and trial court "vindictively punished" him for having successfully attacked his first
sentence on direct appeal. Due Process of law requires that vindictiveness against a defendant for having successfully
attacked his first conviction must play no part in the sentence he receives after a new trial. North Carolina v. Pearce, 395
U.S. 711, 725 (1969).

In Chaffin v. Stynchcombe, 412 U.S. 17 (1973) the Court considered whether the Due Process Clause of the Fourteenth
Amendment barred the jury from rendering higher sentences on retrials following reversals of prior convictions. The Court
stated that "The rendition of a higher sentence by a jury upon retrial does not violate the Double Jeopardy Clause. Nor does
such a sentence offend the Due Process Clause so long as the jury is not informed of the prior sentence and the second
sentence is not otherwise shown to be a product of vindictiveness." Id., at 36. (emphasis added). There is no presumption
of vindictiveness when a jury assesses the subsequent punishment. Id. Further "[T]he Due Process Clause is not offended
by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of
'vindictiveness.'" Blackledge v. Perry, 417 U.S. 21, 27 (1974). "The decision as to whether prosecutorial vindictiveness
exists must be decided on a case-by-case basis, based on each individual record." Lopez v. State, 928 S.W.2d 528, 533
(Tex. Crim. App. 1996).

Appellant argues that comments in the State's final summation encouraged the jury to impose a more severe sentence on
him because of the fact that he appealed his first conviction. We do not believe these comments clearly so encouraged the
jury. The remarks at issue are to the effect that appellant is still actively denying commission of the offense both to his wife
and to the community. We do not necessarily draw the conclusion from these statements that the prosecutor, with these
words, improperly encouraged the jury to punish appellant for exercising his right to appeal.

The remarks about which appellant complains are the following, made by the prosecutor during his closing argument:

Lastly, I want to tell you this. I believe in my heart of hearts from the evidence in this case of the crime he committed-the
crimes he's committed, still trying to divide the community, still lying to the public, still lying to his wife about his
involvement, not standing up to be counted, all of that, he's earned his 99 years, there's no question, and a ten thousand
dollar fine. I think that's appropriate. That is my opinion. . . . 

Juan Hernandez is, to this day, going into the Refugio County community and saying I didn't do this, they're lying on me,
it's a conspiracy. He is dividing that community . He doesn't even have the gumption, the capacity to stand up and be
counted. . . .

Why don't you just accept responsibility and say it's my fault. . . .

Why can't he just accept the responsibility of this?

We do not believe that these remarks encouraged the jury to punish appellant for exercising his right to appeal. Appellant
had the burden to prove that a higher sentence was assessed after his successful appeal as a result of vindictiveness on the
part of the prosecutor. We hold he has failed to meet this burden. Appellant's conviction was not overturned in the original
appeal, but the case was remanded for the sole purpose of holding a new punishment hearing. The prosecutor argued for
ninety-nine years--a sentence within the statutory range of punishment. We view the complained-of comments as merely
stray remarks that do not necessarily lead to the conclusion that the prosecutor was seeking a higher punishment to be
vindictive. In fact, it appears more likely that the prosecutor was arguing for a higher sentence because of appellant's
refusal to accept responsibility for the crime, even in the face of his conviction. That is a legitimate reason for a prosecutor
to argue for higher punishment. Any reference to appellant's successful appeal is far too ambiguous to constitute evidence
of vindictiveness. The State prior to this retrial of punishment offered to recommend an agreed sentence of ten years
imprisonment, but Appellant refused the offer. We do not find the State was acting vindictively and overrule the first issue.

III. Extraneous Crime

In his second issue appellant asserts that he was denied a fair punishment trial because the trial court allowed the State to
introduce evidence of an extraneous offense that was not proven beyond a reasonable doubt. Article 37.07, section 3(a) of
the Texas Code of Criminal Procedure provides:

Evidence may be offered by the State and the defendant as to . . . any other evidence of an extraneous crime or bad act that
is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held
criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a) (Vernon Supp. 2001). The trial court is deemed the authority on the
threshold issue of admissibility of relevant evidence during the punishment phase of a trial, while the jury, as the "exclusive
judge of the facts," determines whether the burden of proof for those offenses presented has been satisfied by the party
offering the evidence. Mitchell v. State, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996). A trial court's actions concerning
the admissibility of extraneous offense evidence is reviewed under an abuse of discretion standard. Saenz v. State, 843
S.W.2d 24, 26 (Tex. Crim. App. 1992); Montgomery v. State, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990). 

We hold that the State offered sufficient evidence that would enable a rational factfinder to conclude beyond a reasonable
doubt that appellant was involved in stealing the missing $404,000. Therefore the trial court did not abuse its discretion in
admitting evidence of this crime to the jury. We overrule the second issue.

IV. Post-Arrest Silence

By issue three appellant asserts that the trial court denied him due process and a fair trial when it allowed the State to
comment on his post-arrest silence. The State may not use a person's post-arrest silence against him. Doyle v. Ohio, 426
U.S. 610, 619 (1976); Sanchez v. State, 707 S.W.2d 575, 580 (Tex. Crim. App. 1986). The general rule is that to preserve
error committed during jury argument a defendant must object until receiving an adverse ruling. Harris v. State, 784
S.W.2d 5, 12 (Tex. Crim. App. 1989);Juhasz v. State, 827 S.W.2d 397, 405 (Tex. App.-Corpus Christi 1992, pet. ref'd). 
Generally improper jury argument is reversible error only when it is so inflammatory that an instruction to disregard cannot
cure its prejudicial effect. Logan v. State, 698 S.W.2d 680, 682 (Tex. Crim. App. 1985).

An effective instruction to disregard can cure the harm flowing from a comment on the accused's post-arrest silence. 
Waldo v. State, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988). (5) In the instant case there was only an isolated reference to
appellant's post-arrest silence, and appellant did not object to these comments. Further the remark was not so inflammatory
that an admonishment could not have remove the prejudicial effect. The State did not continue in an impermissible
argument and made no other mention of appellant's post-arrest silence. Therefore, the failure to object and to ask for an
instruction waived any error. We overrule the third issue.

We AFFIRM the trial court's judgment.

______________________________

J. BONNER DORSEY,

Justice



Do not publish .

Tex. R. App. P. 47.3(b).



Opinion delivered and filed

this 23rd day of August, 2001.

1. Tex. Penal Code Ann. §§ 31.03(f)(1), 32.45(b) (Vernon 1994 & Supp. 2000).

2. Although the correct spelling of the surname is Abrego, the record indicates "Abrega." Thus, we will follow the spelling
in the record.

3. The two female passengers were related to the Juan Garcia Abrega family.

4. Cevallos testified that "In Mexico you don't get interrogated that way like they do over here. Over there you get tortured,
you get beaten and you have to come out with the truth."

5. In Waldo the court stated that an instruction to disregard will be presumed effective unless the facts of the case "suggest
the impossibility of withdrawing the impression produced on the minds of the jury[.]" Waldo v. State, 746 S.W.2d 750, 754
(Tex. Crim. App. 1988).