**Calvin Edward WASHINGTON,**
**Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 065–92.**

Court of Criminal Appeals of Texas,
En Banc.

June 23, 1993.

Walter M. Reaves, Jr., Waco, for appellant.

John W. Segrest, Dist. Atty., and Mark E. Parker, Asst. Dist. Atty., Waco, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

PER CURIAM.

Appellant was convicted of capital murder. *See* V.T.C.A., Penal Code, § 19.-03(a)(2). The trial court assessed a life sentence when the jury answered the second statutory issue in the negative. *See* Article 37.071(b)(2), V.A.C.C.P. (1986). The Tenth Court of Appeals affirmed the conviction. *Washington v. State,* 822 S.W.2d 110 (Tex.App.—Waco 1991). We granted review to determine whether the Court of Appeals erred in holding that the State was allowed to examine a taped interview between a witness for the State and an investigator for the defense. We will reverse.

The victim was found dead in her home on March 2, 1986. She had been beaten and raped. The court's charge to the jury allowed conviction on the theories that appellant, acting either alone or as a party with Joe Sidney Williams, intentionally killed the victim in the course of committing burglary or in the course of sexually assaulting her. The jury returned a general verdict.

The ground for review presented herein concerns evidence procured by Don Youngblood, an investigator working for appellant, who taped a pre-trial interview with Billy Joe Wilkerson, one of the State's witnesses. During his cross-examination of Wilkerson at trial, appellant asked Wilkerson about various statements made during the interview with Youngblood. Wilkerson denied telling Youngblood that he had seen someone named "Don" on the night of the murder. Wilkerson admitted, however, making the other statements which appellant wished to show were contradictory to his trial testimony.[1] During appellant's cross-examination, the State was allowed to hear the recording of the interview in the judge's chambers. Later, during the redirect examination of Wilkerson, the State asked the trial court to require Youngblood to produce the tape recording of the interview. Over appellant's objections that the tape was protected work-product, the court so ordered. The tape was then admitted into evidence and played for the jury.

The Court of Appeals held that the trial court properly required appellant to produce the tape. Although the Court of Appeals stated that general work-product rules should be applied to defense counsel, the Court implicitly held that the tape in question was not protected because it was a recording of a direct statement. *See Washington*, 822 S.W.2d at 116–17. The Court of Appeals expressly held that the tape was properly admitted into evidence under Rule 107 of the Texas Rules of Criminal Evidence, the "Rule of Optional Completeness."[2] *Id.* at 117; *see* TEX.R.CRIM. EVID. 107. We granted review to determine whether the court of appeals erred in holding that the tape was not protected work-product, but before addressing the

merits on that issue, we must first address the court of appeal's holding regarding Rule 107.

## I. RULE 107

■ In its discussion of the issue of the tape-recording's admissibility under Rule 107, the Tenth Court of Appeals held that the entire recording was admissible, reasoning that "if the court had authority to require Appellant [sic] to deliver the tape, then the whole of the 'conversation' between the investigator and Wilkerson would be admissible under Rule 107 because Appellant [sic] first questioned Wilkerson about it." *Id.* at 115. In so holding, the court of appeals misconstrues the rule. Although the contents of a tape are subject to the Rule of Optional Completeness, the rule is not implicated until such time as a party attempts to have a portion of it "given in evidence." TEX.R.CRIM.EVID. 107. Then, the adverse party is entitled to introduce into evidence the remaining parts of the "act, declaration, conversation, writing or recorded statement," or any related "act, declaration, conversation, writing or recorded statement" necessary to a full understanding of the evidence. *Id.* Clearly, the first requirement of Rule 107 is that matter "be given" in evidence. Failing that, there is no justification under the rule for allowing introduction of the entire matter.

Here, no mention was made of the taped conversation, the witness (Wilkerson) was not aware of the tape's existence during his cross-examination, and appellant made no attempt to introduce the tape's contents into evidence. Further, Wilkerson was available to fully answer all questions surrounding his interview by appellant's inves-

---

**1.** A summary reproduction of the exchange between appellant's attorney and the witness Wilkerson is contained in "Addendum A" to appellant's brief to this Court. "Addendum A" is an accurate recitation, and we have reproduced it as Appendix A to this opinion, *post.*

**2.** Rule 107 provides:
 When part of an act, declaration, conversation, writing, or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the

other, as when a letter is read, all letters on the same subject between the same parties may be given. When a detailed act, declaration, conversation, writing or recorded statement is given in evidence, any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence. "Writing or recorded statement" includes depositions.
TEX.R.CRIM.EVID. 107.

tigator. We hold that the court of appeals erred in holding, under Rule 107, that the tape-recording was properly admitted into evidence.

## II. WORK–PRODUCT DOCTRINE

 Having so held, we may now address whether the State had a right to discover appellant's recording. This Court has not been called on to address the issues of the State's right to discovery or the defendant's right to resist discovery by invoking the work-product doctrine in a criminal case. *See* 33 Steven Goode et al, *Guide to the Texas Rules of Evidence: Civil and Criminal* § 503.2, at 232 (1988) [hereinafter Goode]. Discovery in Texas criminal cases has been a "one-way proposition," with the focus on requests by defendants for discovery and the State resisting those requests. *Id.* Criminal defendants do not have a general right to discover evidence in the State's possession, but they have been granted limited discovery by Article 39.14, V.A.C.C.P. *Kinnamon v. State*, 791 S.W.2d 84, 91 (Tex.Crim.App. 1990). No similar provision grants the right to discover evidence to the State. In the context of anticipating during jury voir dire what evidence will be presented at trial, this Court has stated in dicta that the State "has no right of discovery into the defendant's case." *Demouchette v. State*, 731 S.W.2d 75, 81 (Tex.Crim.App.1986), *cert. denied*, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). Without a more elaborate addressing of the State's general right to discovery in criminal cases, we hold that, in this case, the tape was protected work-product.[3]

The work-product doctrine is vital in assuring the proper functioning of the criminal justice system. *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). In defining the scope of work-product, the Supreme Court stated that it "is reflected, of course, in *interviews*, statements, memoranda," and other ways. *Hickman v. Taylor*, 329 U.S. 495, 511, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947) (emphasis added). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which [an attorney] can analyze and prepare his client's case." *Nobles*, 422 U.S. at 238, 95 S.Ct. at 2170. That materials prepared by an agent for an attorney are shielded is a clearly resolved matter:

> ... the [work-product] doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*Id.* at 238–39, 95 S.Ct. at 2170.

In our State, the scope of the work-product doctrine has only been delineated with respect to the State's rights. As the Court of Appeals noted in this case:

> When invoked by the State, the work-product doctrine has generally been limited to documents which do not contain admissible evidence of the offense but instead are summaries of the evidence or discussions about the offense. Examples of materials covered by the doctrine are offense reports, investigative reports prepared by the police, internal prosecution files and papers, reports of lab tests on narcotics, and statements prepared by officers after interviewing prospective witnesses. It does not extend to state-

---

**3.** In a supplemental brief to this Court, the State contended for the first time that the work-product privilege did not apply here because the investigator was not working for appellant or his counsel. The investigator interviewed Wilkerson in preparation for Joe Sidney Williams' trial. Appellant counters that the tape would still be protected since he and Williams share a common interest. Without addressing the mer- its of either argument, we find that the State waived this claim by not presenting it before the court of appeals or on original submission to this Court. *See, e.g., Rochelle v. State*, 791 S.W.2d 121 (Tex.Crim.App.1990); *Kalmbach v. State*, 481 S.W.2d 151 (Tex.Crim.App.1972). Therefore, we decline to review the State's claim here.

ments by witnesses, ... to statements used before the jury, or to tape recordings of direct statements.

*Washington,* 822 S.W.2d at 116 (citations omitted).

■ This Court has examined the scope of the work-product rule in determining whether recordings of interviews with witnesses were discoverable.[4] *Cullen v. State,* 719 S.W.2d 195 (Tex.Crim.App.1986). At one extreme, a recording of a statement made by a witness without any questions by the interviewer is clearly discoverable. *Id.* at 198; *cf. Quinones v. State,* 592 S.W.2d 933, 940 (Tex.Crim.App.1980), *cert. denied,* 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 *reh'g denied,* 449 U.S. 1027, 101 S.Ct. 600, 66 L.Ed.2d 490 (conversation between defendant and cohort which contained direct, material evidence about offense and was recorded by police not protected by work-product privilege; privilege not designed for and not applied to shield recorded statements of accused as opposed to ordinary witness). At the other extreme, a recording is not discoverable if it contains only comments by the attorney concerning his trial strategy or opinions of the strengths and weaknesses of the case. *Cullen,* 719 S.W.2d at 198; *Johnson v. State,* 650 S.W.2d 784, 790 (Tex.Crim.App. 1983) (officers' additions to transcript of tape recorded conversation between defendant and co-conspirator were interpretation of original tape and therefore work-product). If the recording falls within the two extremes, the trial court must examine it *in camera,* decide which portions are discoverable, and order a copy of the tape consisting of those portions to be delivered to the side requesting it. *Cullen,* 719 S.W.2d at 198. The *Cullen* analysis applies in this case.

Here, the trial court examined the tape *in camera* with both parties present. This examination occurred before the State requested production of the tape and without objection by appellant.[5] The court made no explicit findings about which portions of the tape were discoverable. Later, when the State requested production of the tape, the trial court overruled appellant's work-product objection and ordered the whole tape turned over to the State.

Evaluating the credibility of an adverse witness is an important aspect of trial preparation. The State concedes that one purpose of the interview of State's witness Wilkerson was to gather information which could later be used to impeach the witness. *See* State's Br. at 5. In other words, the interview at issue here was an attempt both to evaluate the strengths and weaknesses of the State's case and to prepare appellant's case. *See Nobles,* 422 U.S. at 238, 95 S.Ct. at 2170. This Court has held that the work-product privilege applies in similar cases.

In *Cullen,* the defendant argued the trial court erred in denying his requests to hear

---

**4.** We take guidance from cases discussing the *Gaskin* rule. *See Gaskin v. State,* 172 Tex.Crim. 7, 353 S.W.2d 467 (1961). The *Gaskin* rule allowed the defendant to discover statements made by the State's witnesses after they had testified. That rule has been subsumed by Rule 614 of the Texas Rules of Criminal Evidence.

**5.** This case was complicated somewhat because in addition to the interview with the investigator, Youngblood, an interview between Wilkerson and Truman Simons, a deputy sheriff who investigated the case, was also taped. While Wilkerson was being cross-examined about the conversation with Simons, the State objected that the defense counsel was distorting what was said on the tape. Defense counsel first replied that they would "be glad to play the [Simons'] tape" and then said, "How about playing both tapes?" Next, the parties went into the judge's chambers and the judge asked defense counsel to play the tape recording of the interview between Wilkerson and Youngblood so the State could hear it. Appellant did not object, and the tape was apparently played.

The State did not request production of the tape until its redirect examination of Wilkerson. By the time the request for production of the tape was made and first objected to as work-product, the State had already heard the tape. The State has never asserted that Appellant waived the work-product privilege when defense counsel suggested that both tapes be played or when Appellant allowed the State to hear the tape during the *in camera* examination, and we therefore express no opinion on the merits of such a claim. The State's sole waiver argument is that Appellant waived whatever work-product privilege existed by questioning Wilkerson about the conversation with Youngblood. *See discussion infra* at p. 189.

tape recordings of two interviews the prosecutor had with a State's witness who was also a co-defendant. 719 S.W.2d at 197. The defendant requested the tapes during pretrial proceedings and during his cross-examination of the witness at trial. *Id.* This Court reviewed the tapes on appeal and determined the tape-recorded interviews constituted the State's work-product. *Id.* at 198. The Court stated "[c]learly the purpose of the interview was to prepare the witness for his trial testimony[,]" and then quoted the Court of Appeals with approval, stating "the tape recorded interviews are analogous to a prosecutor's notes taken of an interview with a prospective witness and do not constitute 'statement' within the meaning of the *Gaskin* rule." *Id.* at 198–99. Consequently, this Court held that a recording of an interview preparing a witness for trial was not discoverable. *Id.* at 198.

Also, in *Brandley v. State*, 691 S.W.2d 699, 713 (Tex.Crim.App.1985), this Court found no error in the trial court's ruling that a police officer's transcription of his tape-recorded interview with a State's witness was not admissible. There, the defendant contended the trial court erred in refusing to allow him to recall that State's witness for further cross-examination and impeachment. The trial judge ruled that the police officer's offense report, which contained his transcription of the taped interview, was not a "statement" because it was neither signed nor read by the State's witness, and that it was part of the officer's investigative work-product. 691 S.W.2d at 713. This Court accepted the characterization of the tape recording as work-product, noting that the defendant had not "in any way" shown that the tape was not work-product. *Id.* We likewise find that because the interview at issue in the case-at-bar was conducted to prepare appellant's case for trial, the recording was protected work-product.

■ The State next argues that appellant waived any work-product privilege by questioning Wilkerson about his conversation with Youngblood. We reject this argument. The United States Supreme Court addressed the waiver issue in a similar case. *See Nobles*, 422 U.S. at 225–40, 95 S.Ct. at 2160–71. In *Nobles* an investigator for the defense had interviewed two prosecution witnesses and "preserved the essence of those conversations in a written report." *Id.* at 227, 95 S.Ct. at 2164. Then, "defense counsel sought to impeach the credibility of [those] key prosecution witnesses by testimony of [the] defense investigator regarding statements previously obtained from the witnesses by the investigator." *Id.* The trial court refused prosecution requests to view the report after the cross-examination of the witnesses, but ruled that it would require the defendant to submit an edited copy of the report to the prosecution if the investigator testified. *Id.* at 228, 95 S.Ct. at 2165. Without expressly holding that the report was protected work-product, the Supreme Court held that the defense waived any privilege it had by electing to present the investigator as a witness. *Id.* at 238–39, 95 S.Ct. at 2170. The Court noted that normally no waiver occurs when counsel relies on privileged material to examine a witness:

> Counsel necessarily makes use throughout trial of the notes, documents, and other internal materials prepared to present adequately his client's case, and often relies on them in examining witnesses. When so used, there normally is no waiver. But where, as here, counsel attempts to make a testimonial use of these materials the normal rules of evidence come into play with respect to cross-examination and production of documents.

*Id.* at 239, n. 14, 95 S.Ct. at 2171 n. 14. Thus, "[t]he privilege derived from the work product doctrine is not absolute. Like other qualified privileges, it may be waived." *Id.* at 239, 95 S.Ct. at 2170.

■ In Texas, "testimonial use" is expressed as "use before the jury," a term most typically associated with a defendant's request for production of work-product shielded materials used by the State at trial. "The work product privilege has generally been limited to documents which themselves do not contain admissible evidence of the offense but instead are sum-

maries of the evidence or discussions about the offense that have been prepared for the internal use of law enforcement officers[,]" but this privilege does not extend to statements used before the jury. *Quinones,* 592 S.W.2d at 940. A document has been "used before the jury" when shown to a witness on the stand, identified by a witness, or partially read aloud to the jury. *Mendoza v. State,* 552 S.W.2d 444, 448 (Tex.Crim.App.1977). *See also Haywood v. State,* 507 S.W.2d 756 (Tex.Crim.App.1974) ("use before the jury rule" inapplicable where defendant calls witness and asks for offense report); *White v. State,* 478 S.W.2d 506 (Tex.Crim.App.1972) ("use before jury rule" not triggered by silent reading of document by prosecutor where document is not called to witness's attention or exhibited to witness or he is not questioned in such way that contents of document become an issue); *Sewell v. State,* 367 S.W.2d 349 (Tex.Crim.App.1963) (Opinion on Rehearing) (no use of offense report before the jury where officer used it only to refresh his memory before testifying); *Bailey v. State,* 365 S.W.2d 170 (Tex.Crim.App. 1963) (rule applicable to photograph used by State when questioning officer); and *Jackson v. State,* 166 Tex.Crim. 348, 314 S.W.2d 97 (1958) (statement used before the jury where witness while testifying used statement to refresh memory). In other words, the State's counsel "must in some way inform the witness that the document or statement is being referred to during the examination[ ]" and the contents put before the jury in such a way that they become an issue before the defendant is entitled to inspect the documents. *Mendoza,* 552 S.W.2d at 448 (*citing Rose v. State,* 427 S.W.2d 609 (Tex.Crim.App.1968); and *Sewell,* 367 S.W.2d at 349). We perceive of no justification for not extending the same

test to work-product claims of a defendant, and do so today.

In this case, appellant never attempted to make a "testimonial use" of the materials. While cross-examining Wilkerson about the interview with Youngblood, appellant did not indicate that the interview had been recorded, did not offer the tape to refresh Wilkerson's memory, and did not offer the tape as extrinsic evidence of prior inconsistent statements. Trial counsel's mention of the interview was merely to inform the witness as to what he was referring, and not for the purpose of presenting the contents of the conversation either into evidence or for the purpose of direct impeachment. Instead, appellant's counsel inquired of an adverse witness, in general terms, the substance of a conversation had with counsel's agent. The witness responded out of his own personal recollection. Such a manner of questioning is consistent with the purpose of adequately investigating a client's case and using any information gleaned therefrom during the course of cross-examining a hostile witness. Thus, we hold that appellant did not waive the work-product privilege because appellant did not make testimonial use of the tape.[6]

Having determined that the tape was protected work-product and that appellant did not waive his work-product privilege, we hold the trial court erred in requiring appellant to produce the tape. Appellant's ground for review is sustained.

Accordingly, we reverse the decision of the court of appeals, and the cause is remanded to that court for a harm analysis. *See* TEX.R.APP.P. 81(b)(2).

McCORMICK, P.J., dissents.

**6.** In its brief, the State maintains that it "would be allowed to inspect the prior statement between Wilkerson and the investigator, even if Appellant [sic] had a work-product privilege, he waived this privilege." State's Br. at 3. This waiver follows, it avers, because Rule 612 dictates that, when requested, opposing counsel must be shown a writing used to put forth prior inconsistent statements of a witness, and that this occurred "when Appellant [sic] cross-examined the State's witness trying to impeach

him...." *Id.; see* TEX.R.CRIM.EVID. 612. The State's interpretation is incorrect. As noted, appellant did not make testimonial use of the tape recording and, therefore, the work-product privilege stood in superior position to the State's claim under Rule 612; thus, there could not have been a waiver because the State was never entitled to review appellant's materials. *Nobles,* 422 U.S. at 240, n. 14, 95 S.Ct. at 2171, n. 14; *cf. Quinones,* 592 S.W.2d at 940.

MEYERS, Judge, concurring.

I join the opinion of the Court, and write here only to express my own view of the matter raised by Judge Miller's dissenting opinion. As I understand our precedents, the question whether, having found error in the judgment below, this Court should remand for a harm analysis in the Court of Appeals, has already been settled contrary to the opinion of Judge Miller. Last year, for example, in *Saenz v. State*, 843 S.W.2d 24 (Tex.Crim.App.1992), and *Gipson v. State*, 844 S.W.2d 738 (Tex.Crim.App.1992), five members of this Court expressly subscribed to the view that we should not perform a harm analysis in the first instance when exercising our discretion to review judgments of the courts of appeals. Rather, when we have found error in the judgment of a lower appellate court, it is our rule that the case should be remanded for a harm analysis, if such analysis is required and has not already been performed satisfactorily by the lower court. Because I was not a member of this Court when *Saenz* and *Gipson* were decided, I take this opportunity to express my own approval of the essential holding in those cases. The rule of precedent thus binds this Court, in my view, to remand the instant cause for a harm analysis in the Tenth Court of Appeals. The bench and bar should not be misled by Judge Miller's separate opinion into thinking that the question is still open.

CAMPBELL and WHITE, JJ., join.

MILLER, Judge, concurring and dissenting.

I agree with the majority's treatment of appellant's sole ground for review and therefore join that opinion. I do not agree, however, that this cause should be remanded to the court of appeals for a harm analysis. Tex.R.App.Proc. 81(b)(2). I, like my brethren Baird and Overstreet, believe that this Court should perform this analysis. *See Saenz v. State*, 843 S.W.2d 24, 30 (Tex.Crim.App.1992) (Baird, J., concurring

and dissenting), and *Owens v. State*, 827 S.W.2d 911, 918 (Tex.Crim.App.1992) (Overstreet, J., concurring and dissenting). I agree that "the more appropriate disposition would be for this Court to make such a [harm] determination now while the case is before us rather than keeping it in 'appellate orbit' by remanding it back to the court of appeals." *Owens*, 827 S.W.2d at 918. Therefore, in this cause I would perform the harm analysis in the following vein and remand this cause to the trial court for a new trial.

In determining whether an appellant has been harmed by error below, we examine the effect of the error by considering its source, nature, emphasis and probable collateral implications; i.e., the error's possible prejudice upon the jury's decision. *Harris v. State*, 790 S.W.2d 568, 584–88 (Tex.Crim.App.1989).

Without question, appellant's trial was a highly contested one, and the witnesses relied upon by the State differed both in terms of their credibility and their importance to the State's case. Appellant's brief to the court of appeals contains an uncontroverted rendition of the testimony of several witnesses which places the testimony in context. Five of the State's witnesses [1] testified that they had observed appellant and Joe Sidney Williams either in or exiting a blue-green pontiac which later proved to be the victim's automobile. Three State's witnesses [2] testified that appellant had, on the night of the crime, attempted to sell a VCR and a microwave oven to various individuals, while appellant's brother-in-law, Don Davis, and an inmate, Sammy Joe Crawford, testified that appellant had admitted burglarizing the victim's house, but had denied killing the victim. Crawford also stated that appellant admitted having sexual intercourse with the victim. Additionally, Booker Sterling related that while standing outside the closed door of a motel room, he overheard a conversation in which appellant stated that he and Williams had beaten the victim to prevent her from testifying. Fate Dotson, who was in the room

---

1. Billy Joe Wilkerson, Larry Dotson, Harold Brown, Waymond Dotson and Alberta DeGrate.

2. Brown, Waymond Dotson and Booker Sterling.

at the time, testified that appellant inquired of Williams as to why he had bitten a woman, and Williams had responded " 'never mind'."

Despite this testimony, all of the witnesses mentioned were suffering from some defect sufficient to call into question their credibility. Don Davis "admitted to having mental problems, and ... to hearing his father's spirit and voice" (which would, at times, "take over his body"), and that he was not being treated for this condition when appellant conversed with him in jail. Similarly, Booker Sterling was subject to a pending indictment for delivery of drugs. Finally, Sammy Joe Crawford was a jail inmate who had been to prison on three occasions: twice for burglary and once for forgery.[3]

In contrast to the testimony of the other State's witnesses which either connected appellant with Williams or tended to provide exculpating statements regarding the victim's murder, Billy Joe Wilkerson also recounted appellant's alleged admission of murder. Appellant notes in his brief before the court of appeals that "Wilkerson was an important witness" because "[h]e put Appellant [sic] together with Joe Sidney Williams[,]" and because he "related inculpatory statements which he heard Appellant [sic] make."[4] Appellant's Br. to the Court of Appeals at 44. Like the other State's witnesses, Wilkerson's credibility was in issue due to his chronic drug use, prior convictions for forgery and possession of cocaine, and his having been paid by a friend for his testimony. Considering those facts, his wavering recollection regarding his sobriety and the night's events would have been less than surprising to the jury; the reliability of those comments would, therefore, have been a major issue. Unlike the other witnesses however, his recitation of the alleged admission (which was never actually impeached) was improperly buttressed when it was played before the jury. Wilkerson's testimony, in comparison to the testimony of the other witnesses, was significantly more important: given the lack of overwhelming evidence of appellant's guilt, it is safe to say that he was the State's "Star Witness."

The record reflects that counsel for the defense did not attempt to introduce the tape into evidence, and that no reference was made to it. Further, the trial court granted the State's request for production of the item over the defense counsel's repeated strenuous objections against being directed to provide work-product they "required during the course of [their] preparation for the defense of th[e] trial." Statement of Facts, Vol. IV, p. 798. The trial court, during the *in camera* hearing, made no attempt to separate items on which the witness was impeached from matters on which he clearly was not.[5] Thus, the State's airing in the presence of the jury of a recording never utilized by the defense in open court can be seen as an improper attempt to bolster Wilkerson's testimony on the inculpatory comments relating to appellant.

Reviewing the record of this hotly contested cause in light of the trial court's error in failing to exclude the contents of the tape recording as appellant's work-product, I cannot conclude beyond a reasonable doubt that the error made no contribution to his conviction. *See* TEX. R.APP.P. 81(b)(2); *Harris*, 790 S.W.2d at

---

**3.** Likewise, other witnesses for the State had doubtful credibility. Geraldine Douglas was on probation for welfare fraud; Larry Dotson had been convicted of three felonies and four to six misdemeanors; Harold Brown had been convicted of a drug offense; Waymond Dotson admitted to perjury during the previous trial of co-actor Williams; and Alberta DeGrate had served three sentences in prison and was on parole at the time of trial. Attempting to further discredit the State's witnesses, the defense presented the testimony of eighteen police officers and two private investigators all of whom testified as to the bad reputations for truth and veracity of various witnesses.

**4.** Appellant's assertions are not controverted by the State.

**5.** This should not be read to imply that presenting a redacted version of the tape would have saved the trial court's ruling; in fact we have ruled that the entire tape was privileged. That the *in camera* hearing resulted in full production of the recording simply lends further credence to the idea that appellant was harmed.

588. Therefore, I would reverse the decision of the court of appeals and remand this cause to the trial court for a new trial. Because the majority does not engage in this harm analysis, I dissent to the remand to the court of appeals.

BAIRD and OVERSTREET, JJ., join this concurring and dissenting opinion.

### Appendix A

Q: In the course of that conversation with Mr. Youngblood, do you recall answering a question he put to you that was along these lines: He wanted to know if you were going to testify and if you had been subpoenaed and what you had to say. And you responded something to the effect of "I'm just going to say that I saw him the night that he did it"—and then Mr. Youngblood asked you "who did you see?", and do you recall responding "Don"?

A: No.

Q: You don't recall that period—did that happen? *Did he ask you that question, and did you respond first with the name Don?*

A: *No.* (R. 4757–758). (emphasis supplied).

Q: Do you recall the conversation with Mr. Youngblood on that same occasion when you were asked if you had gone from the apartment complex over to Clifton street, do you recall answering him, yes that you rode in that green car with Calvin?

A: Say that again.

Q: Do you recall being asked where you went when you left the apartment complex on the night that you are saying this happened. And you recall in responding to him that you left the apartment complex and got a ride with Mr. Washington in that green car, bluish green car that you had been talking about? Do you remember telling Mr. Youngblood that?

A: Yes.

Q: *So what you have just told this jury here this morning about never having seen that car again is not true is it?*

A: I wanted to get him out of my house. I was telling him anything.

Q: *You just be telling him anything?*

A: Uh-huh.

Q: *But you did tell him that?*

A: Yes. (R. IV 758–759). (emphasis supplied).

Q: Let me ask you, sir: Do you recall in response to a question by Mr. Youngblood on August 17, 1986 at your home—do you recall saying to him, yes, I was high?

A: Yes.

Q: Okay. Did you in fact go on to describe to him—

A: He asked me if I got high. I told him, yes, I got high. I didn't say I was high at the time.

Q: You now deny that you told Mr. Youngblood that you were high on the occasion of whatever day it was that you say you had this contact with Calvin Washington?

A: Uh-huh.

Q: You deny that to this jury?

A: No.

Q: And you also deny that you ever told Mr. Youngblood that you were high on that occasion?

A: No I didn't deny it.

Q: Let me ask you this. *Would you tell the jury whether or not you told Mr. Youngblood on August 17, 1986 that when you had this experience that you have related with Calvin Washington that you were in fact high on drugs?*

A: *Yes.*

Q: *You did tell him that?*

A: *Yes.* (R. IV 762–764). (emphasis supplied).

Q: Let me ask you about that same conversation again as relates to August the 17th, 1987. On that occasion when Mr. Youngblood was asking you questions about this incident that you have related, did you in fact tell Mr. Youngblood on that occasion that you had

seen that car and with Calvin Washington in it on an earlier occasion prior to the time that you saw it there at the apartment complex?

A: I don't remember.

Q: Okay. Do you deny making the statement

A: No.

Q: Okay. Do you recall saying in fact that you had seen Calvin residing around in that car about the time it was getting dark?

A: Yes. I remember telling him that.

Q: Okay. Now we're talking about a contact that occurred on whatever time it occurred, the same day that you say you saw him walking by the car there in the parking lot when, you're talking to Mr. Youngblood on August 17th about that same very exact date, you also told Mr. Youngblood that you had seen Calvin Washington earlier in the day in that same car about dark?

A: Yes.

Q: And that also is not what you just testified to this jury, is it

A: Sir, now?

Q: That *also is not the same as what you have just testified* to this jury?

A: *No.*

Q: Now, when Mr. Youngblood on that same occasion asked you about drug habits, did you say to Mr. Youngblood that you shoot up at least three or four times?

(objection overruled)

Q: When Mr. Youngblood was asking you about your drug habits then and now as March of 1986 and as August 1987, did you in fact on that occasion when Mr. Youngblood was asking you about your drug habits, did you say to him that you shoot up—meaning that you inject yourself with drugs—three or four times a day, and on Saturday five to ten times a day?

A: Yes.

Q: *You did in fact tell him that?*

A: *Yes.*

Q: *Is that true?*

A: *No.* (R. IV 763–765)