# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00641-CR

**David Hoover, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
### NO. 3040865, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

David Hoover appeals his conviction by a jury of the offense of indecency with a child by contact. *See* Tex. Penal Code Ann. § 21.11 (West 2003). The trial court assessed punishment at 35 years in the Institutional Division of the Texas Department of Criminal Justice. In seven points of error, appellant complains that the trial court unduly restricted testimony regarding the outcry witness's bias and motive and otherwise improperly admitted evidence. We affirm the judgment of conviction.

### FACTUAL BACKGROUND

The State's evidence at trial showed that appellant lived in the same apartment complex as A.M., the complainant who was seven years old at the time of the incident, her six-year-old brother, O.M., and their mother, D.M. In the early evening of March 24, 2004, because her stove was not working, D.M. sent the children to a friend's apartment to get dinner. At some point, A.M.

and O.M. encountered appellant, who invited them into his apartment. The children watched television, and appellant offered them some beans to eat in the kitchen. A.M. testified that while she was in the kitchen appellant touched her "middle part" under her clothing.

D.M. testified that the children returned to her apartment with a man she did not know. D.M. observed that the children's pants were unzipped. Appellant asked her if she needed any help fixing her car and if she was married. In her children's presence, appellant told her, "You have good kids." He then left the apartment.

Because the children seemed scared and "acted like they were in trouble," D.M. asked them what had happened. As A.M. began crying, she told her mother that the children had been in the man's apartment and that he had "pulled her pants down and was messing with her between her legs." D.M. reported the incident to the police that evening. Two weeks later, A.M. and O.M. were interviewed at the Center for Child Protection by Cyndi Cantu, a forensic interviewer. A.M. told Cantu that appellant had touched her on her "middle part" that she uses "to pee with." D.M. and the children later identified appellant in a photographic line-up.

A defense witness who lived three doors away from appellant testified that he was visiting with appellant on the evening in question. Appellant's door was open and the children "just came up to the apartment." The neighbor testified that he saw the children, watched them the whole time they were in the apartment, and never saw appellant touch either child.

**ANALYSIS**

Appellant contends that the trial court erred in (i) restricting cross-examination of D.M., A.M.'s mother, who was the outcry witness, (ii) allowing the admission of inadmissible

2

hearsay and then refusing a limiting instruction, (iii) inadvertently allowing the playing of an inadmissible portion of a videotaped statement, and (iv) allowing testimony by a witness "expressing an opinion on the truthfulness of the complainant's allegations." We review a trial court's decision to admit or exclude evidence using an abuse of discretion standard. *Mozon v. State*, 991 S.W.2d 841, 846-47 (Tex. Crim. App. 1999); *Montgomery v. State*, 810 S.W.2d 372, 379-80 (Tex. Crim. App. 1990) (op. on reh'g).

### *Limitation on Cross-Examination*

In his first point of error, appellant asserts that his right to confront and cross-examine witnesses under the Sixth Amendment of the Constitution was violated when the trial court unduly restricted his cross-examination of D.M., the complainant's mother and the State's outcry witness.[1] Specifically, appellant sought to cross-examine D.M. about her application to the Attorney General for crime victim's compensation and a subsequent request of the Attorney General's office for a refund of the money because D.M. had failed to provide receipts as required showing that the money was used for moving expenses. Appellant sought to question D.M. and to offer documentary evidence, including the written application for compensation and the Attorney General's letter request. He urged that the evidence was admissible to show bias or motive under Texas Rule of Evidence 613. *See* Tex. R. Evid. 613. The State urged that the evidence was improper impeachment

---

[1] Although the State urges that it "is not entirely clear that this claim was preserved for appellate review," we conclude that the parties were aware of the nature of the complaint and that it was preserved. *See Maynard v. State*, 685 S.W.2d 60, 65 (Tex. Crim. App. 1985).

and inadmissible under Texas Rules of Evidence 608 and 609 because it was unadjudicated conduct. *See* Tex. R. Evid. 608-09.

The Sixth Amendment guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. U.S. Const. amend. VI. "Confrontation means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). Its fundamental purpose is to secure for the defendant the opportunity to cross-examine the accuser. *Id*. at 315-16.

Both rules 608 and 613(b) address impeachment of witnesses. Tex. R. Evid. 608, 613(b). Rule 608 allows the credibility of a witness to be attacked or supported in the form of opinion or reputation testimony only by reference to the witness's character for truthfulness or untruthfulness and only after the character of the witness for truthfulness has been attacked. Tex. R. Evid. 608(a). Rule 608(b) expressly bars impeaching a witness's general character for truthfulness with specific instances of conduct other than conviction of a crime as provided in rule 609. Tex. R. Evid. 608(b). Nor may specific instances of conduct be proved by extrinsic evidence. *Id.*

In contrast, rule 613(b) permits impeaching a witness by "proof of circumstances or statements showing bias or interest" on the part of the witness. Tex. R. Evid. 613(b). Unlike rule 608(b), rule 613(b) does not expressly bar the use of specific instances of conduct to show bias or interest. *Compare* Tex. R. Evid. 608(b), *with* Tex. R. Evid. 613(b). Rule 608 does not bar evidence of specific acts not resulting in conviction as an impeachment device in all instances. It proscribes such proof only when offered for a particular purpose—to establish a witness's character for

4

veracity—so the jury may infer that he is more or less likely to be testifying truthfully. Specific acts may, however, be proved for other purposes. For example, a witness's acts may reveal a bias toward or against one of the litigants. 1 Steven Goode et al., *Texas Practice: Guide to the Texas Rules of Evidence: Civil and Criminal* § 608.1 (3d ed. 2002). Rule 608 does not address attempts to impeach a witness through bias. *Id.* (citing *Dixon v. State*, 2 S.W.3d 263, 271 (Tex. Crim. App. 1999) (op. on reh'g)).

Thus, rule 608 addresses a witness's general character for truthfulness and rule 613(b) addresses a witness's trustworthiness in the particular case because of some bias or interest. Unlike attacks on a witness's character for truthtelling, bias or interest may arise when the witness has a financial stake in the outcome of the case. *E.g.*, *Cox v. State*, 523 S.W.2d 695, 700 (Tex. Crim. App. 1975) (admitting evidence that prosecution witness filed civil action against accused); *Sterns v. State*, 862 S.W.2d 687, 690 (Tex. App.—Tyler 1993, no pet.) (allowing testimony that prosecution witness was informant who was paid fifty dollars per case).

In a hearing outside the presence of the jury, appellant sought to show that D.M. applied for and received benefits from the Crime Victims' Compensation Program of the Texas Attorney General's Office. He argued that the application, a victim impact statement, and a letter requesting repayment were relevant to show that D.M. sought financial gain as a consequence of the incident. Appellant sought to show that D.M. submitted a victim impact statement containing a false

statement that she was evicted because the apartment management believed appellant to be innocent. At the hearing, D.M. admitted that she was evicted for nonpayment of rent.[2]

At the conclusion of the hearing, the trial court concluded that the evidence had negligible probative value and allowed appellant to inquire only whether D.M. "made a claim to crime victim's compensation as a result of this prosecution and has she received money." The court excluded the "extraneous letters" and "what is going on behind it." On cross-examination, D.M. then testified that she made a claim for victim compensation based on the facts of the case and that she sought money so she could move: "I didn't know they was going to give you money like that. I just know they would help you move. That's all I know." Appellant argues that false statements given in connection with an application for victim compensation subjects the applicant to criminal prosecution for perjury.

The trial court did not abuse its discretion in excluding a portion of the proffered evidence. There was no showing that the validity of D.M.'s claim hinged upon the pursuit or outcome of the prosecution. D.M. evidently learned of and filed an application after she reported the incident to law enforcement. She testified that she "got the paperwork from the advocacy center" where A.M. gave her videotaped statement. The benefits were paid to D.M. a year before trial. The proffered evidence does not show a tendency to lie, and it is only marginally probative on the issue of bias or motive. Moreover, the record reflects that D.M. was effectively impeached because she was incarcerated at the time of trial serving a sentence for forgery and she had given custody of her

---

[2] The assistant manager of the apartment complex also testified at trial that D.M. was evicted for nonpayment of rent.

children to a relative. We conclude that the scope of permissible cross-examination was appropriate because the degree of possible relevance of the evidence as presented was so low as to be within the "zone of reasonable disagreement," and we thus decline to find that the trial court abused its discretion by excluding the testimony.

Assuming the trial court erred by refusing to permit appellant to cross-examine D.M. concerning the application, we are satisfied that any error was harmless. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). D.M. admitted before the jury that she made the claim in order to move from the complex, that she had not made rent payments on time, that an eviction lawsuit had been filed against her, that she had filed a civil suit against the apartment complex based on allegations of sexual abuse, and that she was incarcerated at the time of trial for forgery. There is no evidence that she influenced her daughter's testimony or pressured either child to fabricate allegations. We overrule appellant's first point of error.

### *Prior Consistent Statements*

In his second, third and fourth points of error, appellant claims the trial court erred in allowing Cyndi Cantu, a forensic interviewer with the Center for Child Protection, to testify to prior consistent statements made by the complainant in her videotaped interview and that the trial court erred in failing to give a limiting instruction and a further instruction in the charge. Because Cantu was not the outcry witness, appellant objected to her testimony about A.M.'s prior consistent statements.

The controversy arises from discrepancies in A.M.'s testimony, which provides context for Cantu's testimony. At trial, A.M. testified that the assault occurred as she was standing

7

in appellant's kitchen. She testified that she was wearing shorts, that the shorts "stayed up," and that appellant touched her "middle part" under her panties for a "short time." On cross-examination, defense counsel elicited testimony that A.M. had stated during her interview with Cantu that the incident happened at her mother's house and that she was wearing "pants." Defense counsel played portions of A.M.'s videotaped interview. The following testimony then occurred during questioning of A.M.:

Q [Defense Counsel]: Do you remember that you spoke with a lady named Cyndi Cantu at the Children's Advocacy Center?

A [A.M.]: Yes.

Q [Defense Counsel]: And you spoke to her about two weeks after this all was supposed to have happened, right?

A [A.M.]: Yes.

Q [Defense Counsel]: Okay. And when you spoke to her, you told her that this all happened at your mom's house. Do you remember that?

A [A.M.]: No.

Q [Defense Counsel]: Do you remember that you made a videotape with her, and she asked you, where did this all happen, and you told her that it happened at your mom's house? Do you remember that? Let me ask you this, [A.M.]: Do you remember a short time ago, right here in this courtroom, you just looked at a videotape?

A [A.M.]: Yes.

Q [Defense Counsel]: And do you remember seeing that portion of the videotape where you were talking with Ms. Cantu?

A [A.M.]: Yes.

8

Q [Defense Counsel]: And do you remember telling her that it happened at your mom's house?

A [A.M.]: Yes.

Q [Defense Counsel]: Okay. So, that did happen. You did tell her that, right? You saw that on the videotape?

A [A.M.]: It didn't happen at my mother's house.

Q [Defense Counsel]: It didn't happen at your mother's house?

A [A.M.]: No.

Q [Defense Counsel]: But you did tell Ms. Cantu that it happened at your mother's house, right? We looked at that together. Do you remember that? Also, [A.M.], you told us that you were wearing shorts when this was all supposed to have happened. Do you remember telling the jury that?

A [A.M.]: Yes.

Q [Defense Counsel]: But you told Ms. Cantu that you were wearing pants. Do you remember that? Do you remember looking at that on the videotape?

A [A.M.]: Yes.

Q [Defense Counsel]: And what did you tell Ms. Cantu 13 days after this was supposed to have happened? What did you tell her you were wearing? [A.M.], you don't have to think about it. Just tell the jury what you saw.

A [A.M.]: They were like pants, but they were short like shorts.

Q [Defense Counsel]: So, you weren't wearing pants; you were wearing shorts?

A [A.M.]: Jean shorts, pants.

Q [Defense Counsel]: You were wearing pants; is that right?

9

After the court sustained the State's objection that defense counsel was misstating A.M.'s testimony, A.M. testified, "It was like these pants, but they didn't pass my knees." Defense counsel then asked that "those portions of the videotape be published to the jury." On redirect examination, the prosecutor sought to play A.M.'s statement on the videotape "about how it happened in the kitchen and she was standing up." These portions of the videotaped interview were played without objection.

When the State then called Cantu to testify, the prosecutor sought to elicit A.M.'s statements on the videotape that were inconsistent with her statements on cross-examination pursuant to rule 801(e)(1)(B). *See* Tex. R. Evid. 801(e)(1)(B). Appellant objected that the statements were inadmissible hearsay because Cantu was not an outcry witness who would be permitted to relate the statements made to her. The court allowed Cantu to testify to prior consistent statements made by A.M. Appellant requested that the court give a limiting instruction at the time the testimony was elicited and again in the charge. The court agreed and then explained that because appellant had not requested any instruction, she would give the instruction "straight from the book." Appellant then asked that the court give an instruction that the testimony was only to be used to rebut a claim of motive and not for all purposes, and the court rejected the request.

Cantu then testified about certain statements made by A.M. during the videotaped conversation. Although Cantu testified to several prior statements that were inconsistent with those elicited from A.M. by defense counsel, appellant objects only to the court's admission of a single statement that he contends was inadmissible. He complains that Cantu testified that A.M. had told

10

her—consistent with A.M.'s direct testimony—that appellant had touched her "middle part" underneath her clothing when they were both standing in appellant's kitchen.

But the record is clear that the court allowed the State to elicit other statements—inconsistent with those elicited on cross-examination and consistent with those elicited on direct—to counter defense counsel's effort to impeach A.M.'s testimony with selected portions of the videotape. Thus, the court allowed the State to introduce Cantu's testimony that A.M. told her that appellant had touched her "middle part" underneath her clothing when they were both standing in the kitchen of appellant's apartment to counter a portion of the videotape reflecting that A.M. was in her mother's house when it happened.

In *Sauceda v. State*, the defense sought to introduce the testimony of a CPS caseworker who interviewed the victim about the alleged incident. 129 S.W.3d 116, 118 (Tex. Crim. App. 2004). The State argued that if such testimony were allowed, the State would be entitled to introduce, in its entirety, a videotape of the interview. *Id.* at 118-19. Although the videotape contained numerous references to uncharged offenses, the trial court ruled that the State could introduce the entire tape into evidence if the caseworker testified, under the rule of optional completeness. *Id.* at 118-19 & n.3 (citing Tex. R. Evid. 107). Because he did not wish to introduce the video itself, defense counsel did not call the caseworker to testify, and appellant was convicted. After the court of appeals upheld the conviction, the court of criminal appeals reversed, holding that the admission of testimony regarding selected portions of the videotape would not "open the door" to the admission of the entire videotape. *Id.* at 121.

11

The court found, however, that the contents of the tape were subject to the rule of optional completeness, and that the rule is implicated when a party attempts to have a portion of a taped statement "given in evidence." *Id.* at 122 (citing Tex. R. Evid. 107). The adverse party is then entitled to introduce into evidence the remaining parts of the "act, declaration, conversation, writing or recorded statement" or any related "act, declaration, conversation, writing or recorded statement" necessary to a full understanding of the evidence. *Washington v. State*, 856 S.W.2d 184, 186 (Tex. Crim. App. 1993). In *Washington*, the court of criminal appeals held that the admission of the tape was error because no mention of the tape was made during cross-examination and the defense made no attempt to introduce the tape's contents into evidence. *Id*. In *Sauceda*, the existence of the videotape was mentioned frequently during cross-examination. 129 S.W.3d at 122.

For an omitted portion of a statement to be admitted, the plain language of rule 107 specifies that it must be "on the same subject" and must be "necessary to make it fully understood or to explain the same." Tex. R. Evid. 107. Thus, so long as the portions of the statement offered by the State were on the same subject introduced by the defendant, and were offered for the purpose of explaining the whole conversation on the same subject, the statements were properly admitted. *Sauceda*, 129 S.W.3d at 123.

Addressing A.M.'s comment that she was in her mother's house when the incident happened, Cantu explained, "The way I understood it was that she was telling me how the event started. She started off at her house and then ended up at his house." Cantu continued:

> [A]s she went on to tell me, it became clear that she was starting off the event by being at her mother's house, and then moving to the guy's house, as she called him,

12

or the white guy, as she called him, and that that was actually where the touching happened.

And so I think because of the hesitancies, the nervousness or trauma that she was having at that time, that was what was making it a little confusing for her to talk about it. But I think she was very clear by the end of the interview about what happened and where it happened.

Because selective portions of the contents of the videotaped interview were relevant to the portions of the interview offered by the defense, the challenged evidence was admissible on the ground of optional completeness to avoid leaving a false impression as to A.M.'s statements. *See* Tex. R. Evid. 107. Thus, upon a showing by the State that the information on the videotape was offered in response to the portions introduced by the defense and was necessary to make A.M.'s testimony fully understood, the evidence was admissible. *See Sauceda*, 129 S.W.3d at 124. Moreover, because the evidence was admissible under rule 107 for all purposes, no limiting instruction was necessary at the time the evidence was introduced or in the charge. Appellant's second, third, and fourth points of error are overruled.

***Inadvertent Playing of Inadmissible Portion of Videotaped Statement***

In his fifth and sixth points, appellant contends that the trial court erroneously denied his motions for mistrial when the judge inadvertently played a portion of a videotaped statement of A.M.'s brother, O.M., that was inadmissible. He urges that the segment inadvertently played was not relevant and included reference to an extraneous offense. The State responds that the excerpt was not inadmissible and, further, that the trial court did not abuse its discretion in denying the motions.

13

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004); *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999). A mistrial is appropriate for "a narrow class of highly prejudicial and incurable errors" and is used to terminate a trial proceeding when the error is so prejudicial that "expenditure of further time and expense would be wasteful and futile." *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). The determination of whether a given error necessitates a mistrial must be made by examining the particular facts of the case. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).

Appellant objected to a portion of the videotaped interview of O.M. after it was played for the jury. Although the record is unclear, an excerpt that referred to appellant touching "O.M. on the bottom" was evidently played during O.M.'s testimony and at the conclusion of the trial when the State sought to reopen the evidence to play the tape. In both instances, the trial court denied appellant's motion for a mistrial after instructing the jury to disregard the excerpt.

The indictment recited the instance of abuse against A.M. alone. In its notice of intent to introduce evidence of extraneous conduct, the State listed nineteen extraneous acts it sought to introduce at trial, including the following:

> On or about March 24, 2004, in Travis County, Texas, the defendant committed the offense of indecency with a child by sexual contact against [O.M.] by touching [O.M.] on his "behind," over the pants, with the defendant's hand.

> On or about March 24, 2004, in Travis County, Texas, the defendant committed the offense of indecency with a child by sexual contact against [O.M.] by touching [O.M.] on his penis.

14

When O.M. testified, defense counsel objected to the introduction of any evidence of abuse of O.M. The prosecutor agreed not to elicit the testimony at that time. The court agreed that "[i]t's not coming out right now" and directed the State "not to talk about that."

Prior to O.M.'s testimony two days later, at the request of the parties, the court played three segments of O.M.'s videotaped interview and advised the jury that one—the first—was presented by the defense and the next two by the State. The record shows that, as the tape evidently began playing the second segment as offered by the State, defense counsel objected to a segment offered by the State as a prior consistent statement and asked that the videotape be stopped. The following colloquy then occurred at the bench:

[Defense Counsel]: I object to the showing of that last portion. That had absolutely no relevance to this case, and it was an extraneous offense. It talked about [O.M.]'s bottom being touched.

[Court]: Did you touch your sister?

[Defense Counsel]: What I heard was that he touched my bottom. Where were you when he touched your bottom?

[Court]: On the second one?

[Defense Counsel]: Right, the second one you just showed.

[Court]: Okay.

[Prosecutor]: The portions I requested to be played—

[Court]: Your objection is noted. It's overruled at this point. If that was played, it was inadvertent on the part of the Court. I was—just so the record will reflect, I was the one that was in charge of the videotape, and I'm trying to get the numbers right. It's very difficult because I'm working two different

15

|                    |                                                                 |
|--------------------|-----------------------------------------------------------------|
|                    | remotes.  Your objection is noted.  If that—it's sustained if that came out.  You can ask for a mistrial. |
| [Defense Counsel]: | I'm asking for a mistrial.                                       |
| [Court]:           | It will be denied at this point.                                |
| [Defense Counsel]: | And I'd ask that the jury be instructed to disregard that portion. |
| [Court]:           | I don't know if they heard that.                                |
| [Defense Counsel]: | Of course they heard it.                                         |
| [Court]:           | It might bring more attention to it.  You want me to say, the only evidence you need to consider is the first snippet at this point?  Okay. |

The court then gave a limiting instruction that "the only evidence that you are to consider at this point is the first portion of the videotape that I played back to you that was presented by the defense, and that's at this point."  Defense counsel then offered that portion into evidence and inquired of O.M. about his statement on the videotape that his sister was wearing a dress on the day in question.

As the trial drew to a close, the State moved to reopen the evidence to "show prior consistent statements of [O.M.]"  After the court overruled defense counsel's objection to the State's reopening, two tape segments were played.  After the excerpts were played, defense counsel objected that the excerpt about "contact with [O.M.]'s bottom" was again inadvertently played.  He asked the court to advise the jury to disregard that portion and requested a mistrial.[3]  The court denied the

---

[3] The record shows that the two motions for mistrial relate to the same segment of the tape, which makes reference, in some manner not fully reflected in the record, to appellant touching O.M. on the "bottom."

motion for mistrial, but gave an instruction: "With regard to the first playback, the Court instructs you that you are only to consider the portion that will be admitted into evidence. If you need to see it again, it's the portion where [O.M.] is asked about his sister on the middle part and where it was." The State then offered the exhibits into evidence, defense counsel did not further object, and the exhibits were admitted.

After each playing of the excerpt, the trial court granted appellant's request for a curative instruction. Appellant did not object to the curative instruction given by the trial court. It is not clear from the record whether the parties conferred sufficiently with the court to avoid the playing of the excerpt that even appellant characterizes as inadvertent and an accident. Although appellant contends that the touching constituted an extraneous offense and was therefore inadmissible, the State asserted that the evidence had "become relevant" with O.M.'s testimony. But the record is not clear precisely what questions and answers are the subject of the objection. And the judge had some difficulty in deciphering what was said on the recording. Although the judge suggested that the jury may not have heard "that," defense counsel responded that "of course they heard it." The precise language objected to never appears in the record before us on appeal or in appellant's brief except to the extent we have referred to it here.

Assuming O.M.'s complained-of testimony about the contact was a reference to an extraneous offense, the trial court's instruction to disregard was sufficient to cure any harm or prejudice from this event. *See Marshall v. State*, No. AP-75,048, 2006 Tex. Crim. App. LEXIS 2444, at *24 (Tex. Crim. App. Dec. 20, 2006) (citing *Young v. State*, 137 S.W.2d 65, 69-70 (Tex. Crim. App. 2004) (mistrial not required where prejudice is curable by instruction to disregard);

17

*Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) (instruction to disregard usually cures prejudice from reference to extraneous offense)). Upon reviewing the record, we find no indication that the excerpt inflamed the jury with information regarding other allegations against appellant. Therefore, we conclude that the trial court's instruction to disregard cured any possible prejudicial effect of the witness's testimony. We overrule appellant's fifth and sixth points of error.

### *Witness's Opinion Testimony*

In his seventh point of error, appellant contends that the trial court erred in allowing the witness Cantu to directly express an opinion on the truthfulness of A.M.'s allegations and that expert witnesses are barred from presenting such testimony.

When A.M. gave conflicting testimony in her interview with Cantu, Cantu testified that she thought A.M. was nervous and traumatized. After Cantu testified that at the beginning of the interview A.M. said the incident happened at "my mom's house" and the "white guy" was "outside," the following exchange occurred:

| | |
|---|---|
| [Prosecutor]: | That doesn't seem to make sense, does it? |
| [Defense Counsel]: | Objection. That snippet of the videotape that the jury is going to be offered speaks for itself. I'm going to object to any reinterpretation of that. |
| [Court]: | Overruled. |
| [Prosecutor]: | So when she's saying to you in the very beginning that the touching took place at her house, but she was inside and he was outside her house, how did you—based on your conversation with [A.M.] and your training and experience in this field, how did you interpret that give and take? |

18

After the court overruled defense counsel's objection that Cantu was "telling the jury how to interpret the evidence," Cantu testified: "The way I understood it was that she was telling me how the event started. She started off at her house and then ended up at his house." Without objection, Cantu then testified that A.M. exhibited confusion about the sequence of events:

> I think that in the beginning, as we talked about, she seemed a little confused. And I was confused about where the actual touching event happened. But then as she went on to tell me, it became clear that she was starting off the event by being at her mother's house, and then moving to the guy's house, as she called him, or the white guy, as she called him, and that that was actually where the touching happened. And so I think because of the hesitancies, the nervousness or trauma that she was having at that time, that was what was making it a little confusing for her to talk about it. But I think she was very clear by the end of the interview about what happened and where it happened.

On cross-examination, the following testimony occurred as defense counsel asked Cantu about her role of "gathering information" in the investigatory stage of the case:

Q [Defense Counsel]:  Well, one possibility is that the child was making a false accusation, isn't it?

A [Cantu]:  That's always possible on any case.

Q [Defense Counsel]:  So when you're saying that you're trying to be impartial, how were you impartial to Mr. Hoover?

A [Cantu]:  My job, again, is to collect information from the child. I can't suggest information to the child or give them any information. I just ask them questions so they tell me what they know.

Q [Defense Counsel]:  Well, did you look for any evidence that the child was giving you a false allegation?

A [Cantu]:  Again, my job is not to collect evidence on the entire case.

19

Q [Defense Counsel]:    I'm asking: Did you collect any evidence from the child that would suggest that she was making a false allegation?

A [Cantu]:    No, I did not.

Cantu acknowledged that she would not know if A.M. fabricated her testimony:

Q [Defense Counsel]:    And so if [A.M.] made this up, you wouldn't know the difference?

A [Cantu]:    What I'm doing is collecting information and basing that information—you know, what I've done is reflected what she's told me and her emotions.

Q [Defense Counsel]:    If [A.M.] made this up, you wouldn't know the difference, would you?

A [Cantu]:    No. I wouldn't know from—because I didn't do the complete investigation.

Q [Defense Counsel]:    If [A.M.] made this up, you wouldn't know the difference?

A [Cantu]:    No, I wouldn't.

Cantu then testified on redirect:

Q [Prosecutor]:    Ma'am, based on your training and experience and based on your interview of [A.M.], do you possess an opinion on whether [A.M.] was telling you the truth or not?

A [Cantu]:    Based on what I saw, she seemed to be very traumatized by an event. And she described an event that could have given her that trauma for her.

Q [Prosecutor]:    So the trauma that you observed in her was consistent with what she described happening to her at the hands of the defendant?

20

A [Cantu]:           Yes.

Appellant urges that this last excerpt constituted impermissible testimony concerning A.M.'s credibility and the truth of her allegations. Although Cantu was asked her opinion on whether A.M. was telling the truth, she responded with her observations of A.M.'s emotional state. This evidence is admissible to meet or explain her testimony given in response to defense questioning. Any error in the admission of the complained-of evidence, however, was harmless because the portions of the record set out above show that appellant brought out essentially the same evidence before it was elicited by the State or that essentially the same evidence was brought out without objection. *See Marshall*, 2006 Tex. Crim. App. LEXIS 2444, at *30 (citing *Leday v. State*, 983 S.W.2d 713, 716-18 (Tex. Crim. App. 1998) (improper admission of evidence is harmless when other such evidence is admitted without objection)). We overrule appellant's seventh point of error.

## CONCLUSION

Having overruled appellant's points of error, we affirm the judgment of conviction.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: February 27, 2007

Do Not Publish

21